## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  EDWARDS        CORNELIUS
_____
(Last)          (First)          (Initial)

Prisoner Number  D-74803

Institutional Address  Correctional Training Facility

P.O. Box 689, Soledad, CA 93960

**FILED**

APR - 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CORNELIUS EDWARDS,
(Enter the full name of plaintiff in this action.)

        vs.

ARNOLD SCHWARZENEGGER, Governor,

State of California,

XXXXXXXXXXXXX

_____
(Enter the full name of respondent(s) or jailor in this action)

Case No. _____  **WHA**
(To be provided by the clerk of court)

**PETITION FOR A WRIT
OF HABEAS CORPUS** **(PR)**

Read Comments Carefully Before Filling In

**When and Where to File**

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS

1  **Who to Name as Respondent**

2       You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12            (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14  Los Angeles County Superior Court          Los Angeles
_____

15                   Court                              Location

16            (b)    Case number, if known   A796780

17            (c)    Date and terms of sentence 12/18/1987, 15 yrs. to life

18            (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                   parole or probation, etc.)          Yes  XX     No _____

20                   Where?

21                   Name of Institution: Correctional Training Facility

22                   Address: P.O. Box 689, Soledad, CA 93960

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second degree murder in violation of Penal Code § 187
_____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS     - 1 -

3. Did you have any of the following?

    Arraignment:                        Yes _____    No _____

    Preliminary Hearing:             Yes _____    No _____

    Motion to Suppress:             Yes _____    No _____

4. How did you plead?

    Guilty _____    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment            Yes _____    No _____

    (b)    Preliminary hearing      Yes _____    No _____

    (c)    Time of plea            Yes _____    No _____

    (d)    Trial                  Yes _____    No _____

    (e)    Sentencing             Yes _____    No _____

    (f)    Appeal                Yes _____    No _____

    (g)    Other post-conviction proceeding    Yes _____    No _____

8. Did you appeal your conviction?        Yes _____    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal        Yes _____    No _____

            Year: _____    Result: _____

            Supreme Court of California    Yes _____    No _____

            Year: _____    Result: _____

            Any other court         Yes _____    No _____

            Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1                  petition?                         Yes _____    No_____

2        (c)    Was there an opinion?          Yes _____    No_____

3        (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                     Yes _____    No_____

5            If you did, give the name of the court and the result:

6         _____

7         _____

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?         Yes _XX_    No_____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17           questions for each proceeding. Attach extra paper if you need more space.

18         I.    Name of Court: Los Angeles County Superior Court

19              Type of Proceeding: _____Habeas corpus

20              Grounds raised (Be brief but specific):

21              a.  SAME AS RAISED HEREIN

22              b._____

23              c._____

24              d._____

25              Result: Denied in part       Date of Result: 10/2/2007

26         II.    Name of Court: Calif. Ct. of Appeals, Second App. Dist.

27              Type of Proceeding: _____Habeas corpus

28              Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS    - 3 -

a. __SAME AS RAISED HEREIN__

b. _____

c. _____

d. _____

Result: __SUMMARILY DENIED_____Date of Result: __1/17/2008__

III.   Name of Court: __California Supreme Court__

Type of Proceeding: __Petition for Review__

Grounds raised (Be brief but specific):

a. _____SAME AS RAISED HEREIN_____

b. _____

c. _____

d. _____

Result: __SUMMARILY DENIED_____Date of Result: __3/19/2008__

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____Date of Result: _____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes __XX__   No____

Name and location of court: _____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS   - 4 -

need more space.   Answer the same questions for each claim.

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION FOR GOVERNOR SCHWARZENEGGER
TO REVERSE PETITIONER'S GRANT OF PAROLE WHEN THERE IS
NO EVIDENCE PETITIONER IS A <u>CURRENT</u> THREAT TO PUBLIC
SAFETY AND THE STATE COURT AFFIRMING THE DECISION ON
THE SINGLE REASON OF PAST CRIMINAL HISTORY.

---

### I N T R O D U C T I O N

Cornelius Edwards (hereafter Petitioner), submits his federal
habeas corpus alleging the California courts, in the only "reasoned"
decision by the Superior Court of Los Angeles County filed on October
2, 2007 (EXHIBIT 1; see also California Supreme Court decision dated
March 19, 2008 attached thereto), was an abuse of discretion when
it affirmed Governor Schwarzenegger's decision of March 27, 2007
(EXHIBIT 2), reversing the Board of Parole Hearings (hereafter Board),
finding Petitioner suitable for parole (EXHIBIT 3).

In that the state court reversed the Governor on the commitment
offense, for the second time (see EXHIBIT 4, Governor's decision
dated December 22, 2003; cf. EXHIBIT 5, state court decision dated
November 23, 2004), and postconviction factors, affirming the
Governor's decision on the single reason of prior criminal history,
Petitioner will limit his facts and argument to relative evidence
that his prior criminal history is not of the "gravity" that would
suggest a CURRENT threat to public safety and he therefore "requires
a more lengthy period of incarceration"; the state court therefore
violated Petitioner's constitutional guarantee to due process.

///////

- 5 -

Answers to 6(b) - Supporting cases and authorities

In 2003, after Governor Sachwarzenegger reversed Petitioner's grant of parole based on (1) the commitment offense; (2) prior criminal history; and (3) postconviction behavior (EXHIBIT 4), the Superior Court of Califronia, County of Los Angeles, the Honorable Terry A, Green, Judge, although sustaining the Governor's decision, specifically held "there is no evidence that the motive was inexplicable or very trivial (regulation) or 'especially heinous, atrocious, or cruel' because it was carried out in a dispassionate and calculated manner" (EXHIBIT 5, p. 2).

When Petitioner returned for a subsequent parole suitability hearing on June 8, 2006, he was again found suitable for parole (EXHIBIT 6); however, because of an equipment malfunction the hearing was not recorded and a new hearing was scheduled. Thus, Petitioner has been found suitable for parole three (3) times, with only two of the decisions making it to the Govenror.

On the single reason relied upon by the trial court in the Governor's 2007 decision, the Governor writes (EXHIBIT 2, p. 2):

"When he committed this crime, Mr. Edwards was 26 years old. According to the sentencing court, he 'suffered numerous prior convictions and these convictions are of increasing seriousness and also reflect a pattern of violent conduct.' As a juvenile, Mr. Edwards was arrested, but apparently not adjudicated, for possession of a dangerous weapon and assault with a deadly weapon. As an adult, he was convicted for possession of a controlled substance, exhibiting a firearm, carrying a loaded firearm in public, battery, sale of a substance in lieu of a controlled substance, and shooting at an inhabited dwelling. According to the sentencing court, he was on probation for the latter offense at the time of the murder. Mr. Edwards was also arrested, but not convicted, for carrying a loaded firearm in public, assault with a deadly weapon, being under the influence of a controlled substance, murder, robbery, and giving false information to a peace officer. In addition, he used marijuana, PCP and cocaine prior to the life offense, and he admitted to the 2006 Board that he sold drugs prior to the life offense. [¶] "Mr. Edwards' extensive adult criminal record and his continued failure to live within the rules of his environment in prison -- particularly given the violent and aggressive nature of some of his conduct -- weigh heavily against his parole suitability at this time."

The record reflects that during the suitability hearing, the Board extensively covered Petitioner's prior criminal history, getting explanations for many of Petitioner's prior contact with law enforcement (EXHIBIT 3, HT 24-32).[1]

At age 13 Petitioner talked his grandfather's cousin, who was drunk, into letting Petitioner drive his car around the block. The police, seeing a 13 year old driving the car, pulled him over and subsequently found a pistol in the trunk of the car. Petitioner was released to his mother (HT 24:21-25:16). The "assault with a deadly weapon" was Petitioner hitting an older boy with a stick protecting his sister (HT 25:17-26:11). The "loaded firearm in public" was rejected when the District Attorney realized Petitioner was simply transporting a shotgun, openly in his car, to his uncle's residence (HT 27:2-15).

In short, the Governor relies on "carrying a loaded firearm in public, assault with a deadly weapon, being under the influence of a controlled substance, murder, robbery, and giving false information to a peace officer" as part of Petitioner's criminal history (EXHIBIT 2, p. 2). All were allegations, and all were dismissed, the allegation of murder being dismissed in a case of mistaken identity (HT 31:11-32:5).

A review of Petitioner's prior criminal convictions that are valid, although admittedly many, are mostly drug related, with the only serious offense involving a threat to the public, being shooting at an occupied vehicle in violation of Penal Code § 246, for which

---

1. References to the parole hearing transcript will be noted by HT followed by page number when needed, e.g. (HT 1:1).

Petitioner was convicted, not as the shooter, but an aider and
abettor, being sentenced to 6 months in the county jail and 5 years
probation.

Petitioner admitted that he had "been dealing drugs for a long
time" (HT 19:16-17), candidly admitting, "I wanted money and I wanted
it now, and I started selling drugs" (HT 20:25-26), but also held
"some pretty decent jobs" as assistant sales manager for Budget Truck
Rental; Designs Unlimited; production work in Hollywood; K-Mart;
and Arco Towers (HT 21:12-26). It was Petitioner's lifestyle, selling
drugs, that his prior criminal activity revolved around and led up
to the commitment offense.

Relevant to current threat to public safety, in all three
instances of finding Petitioner suitable for parole, the Board relied
on forensic evidence presented in the psychiatric evaluation prepared
by Dr. Macomber and Dr. Zika (EXHIBIT 7), and also in Petitioner's
file was Petitioner's prior psychiatric evaluation by forensic experts
(EXHIBIT 8).

After an extensive interview with Petitioner, reviewing his
prior criminal history, the commitment offense, and postconviction
behavior (EXHIBIT 8, p. 1-3), it was Dr. Macomber's expert opinion
that Petitioner "is no more dangerous than the average citizen in
the community. He certainly is definitely below average in comparison
to other inmates" (EXHIBIT 8, p. 3).

Three years later, Petitioner "does not pose any more risk to
society than the average citizen in the community. This is supported
by the Level of Service Inventory-Revised, which is an acturial
measure that assesses criminal history, drug abuse, current attitudes

- 8 -

and other factors to determine current risk level on parole.  His
score places him in the low risk category.  At this point in his
life, he does not pose a risk to society.  In fact, based upon his
life experience and his growth and maturity, he probably poses a
lower risk to society than the average citizen" (EXHIBIT 7, p. 3).

    The Governor, nor the trial court, cited any contravening
evidence.

### SUPERIOR COURT DECISION

    In the trial court's decision (EXHIBIT 1), the Honorable Peter
Espinoza, Judge, reversed the Governor's decision on two grounds,
the commitment offense and postconviction behavior, but sustained
the Governor's decision on the ground of Petitioner's prior criminal
history because "there is some evidence to support the Governor's
findings that the Petitioner has a previous record of violence.
Cal. Code Regs., tit. 15, §2402, subd. (c)(2).  Among his many prior
convictions, the Petitioner was convicted of exhibiting a deadly
weapon, assault with a deadly weapon, and battery" (EXHIBIT 1, p. 2).

    The trial court concluded: "The Governor's decision may be
upheld, despite flaws in his findings, if it is clear he would have
reached the same decision absent the errors.  See In re Dannenberg
(2005) 34 Cal.4th 1016, 1100.  Here, it appears the Governor would
have denied parole based on the Petitioner's previous record of
violence, as he noted that the Petitioner's 'extensive criminal
record...weigh[s] heavily against his parole suitability at this
time'" (Id.).  The trial court then, at the end of its decision,
cited In re Jacobson (2007) 154 Cal.App.4th 849, 860; In re Hyde
(2007) 154 Cal.App.4th 1200, 1212 ["Only a modicum of (any) evidence

- 9 -

is required"]).

What the trial court omitted with ellipsis is, "and his continued failure to live within the rules of his environment is prison -- particularly given the violent and aggressive nature of his conduct"; which the court found was not supported by the evidence in case at bench, therefore being distinguished from cases cited by the trial court and affirmed by the state Supreme Court.

* * * * * * *


If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

No new grounds are presented.

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No_XX_

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on March 31, 2008                    _Cornelius Edwards_

14                    Date                                  Cornelius Edwards
                                                           Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS  -  11  -

## M E M O R A N D U M   O F   L A W

### A.  Petitioner has A Liberty Interest in Parole

Under California's parole statutes, Penal Code § 3041(b),[1]/
Petitioner has a liberty interest in parole (Greenholtz v. Inmates
of Nebraska Penal and Correctional Complex (hereafter Greenholtz),
442 U.S. 1 (1979); Sass v. Board of Prison Terms, 461 F.3d 1123,
1127 (9th Cir. 2006).

Petitioner was diligent in exhausting his state court remedies,
this Court therefore having jurisdiction.

### B.  After 20 Plus Years Into A 15 Years to Life Sentence, There Is No Evidence Petitioner Is A CURRENT Threat to the Public.

Currently, the most persuasive, and instructive case on some
evidence and how it is to be applied and weighed is the recent
decision from the Ninth Circuit Court of Appeals in the precedent
setting case of Hayward v. Marshall, 512 F.3d 536, (9th Cir. 2008).
Relying on In re Lee, 143 Cal.App.4th,1400 (2006); In re Elkins,
144 Cal.App.4th 475 (2006); and In re Scott II, 133 Cal.App.4th 573
(2005) (see Ryman v. Sears and Robuck, 505 F.3d 993, 995 (9th Cir.
2007) ["where there is no convincing evidence that the state supreme
court would decide differently, a federal court is obligated to follow
the decisions of the state's intermediate appellate courts"] internal
quotation marks omitted), analyzing California's parole law, reviewing
federal constitutional protections of the "some evidence" standard
under the application of California law, the Ninth Circuit Court
of Appeals concluded the suitability and unsuitability factors set

---

1.  All codes and regulations are California, unless otherwise noted.
    California Code of Regulations, Title 15, will be cited, Cal. Code Regs.,
    tit. 15.

out in Cal. Code Regs., tit. 15, § 2402(c) and (d), in Hayward v.

Marshall, 512 F.3d, at 543, supra:

> "Even though these suitability and unsuitability factors are helpful in analyzing
> whether a prisoner should be granted parole, California courts have made it clear
> that the 'findings that are necessary to deem a prisoner unsuitable for parole,'
> Irons [v. Carey], 505 F.3d [846,] at 851 [(9th Cir. 2007)], 2007 WL 2927359,
> at *3, are not that a particular factor or factors indicating unsuitability
> exists, but that a prisoner's release will unreasonably endanger public safety.
> In re Dannenberg, 156 Cal.App.4th 1387, 2007 WL 3408290, *9 (Cal. Ct. App. 2007),
> modified, 2007 Cal. App. LEXIS 1985, 2007 WL 4227229 (Cal. Ct. App. Dec. 3, 2007);
> In re Lee, 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal. Ct. App. 2006);
> In re Scott, 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Cal. Ct. App. 2005);
> see Cal. Penal Code § 3041(b) (providing that the Board 'shall set a release
> date unless...consideration of the public safety requires a more lengthy period
> of incarceration for this individual'). For our purposes, then, '[t]he test
> is not whether some evidence supports the reasons the Governor cites for denying
> parole, but whether some evidence indicates a parolee's release unreasonably
> endangers public safety. Some evidence of the existence of a particular factor
> does not necessarily equate to some evidence the parolee's release unreasonably
> endangers public safety.' Lee, 143 Cal. App.4th at 1408 (citations and footnotes
> omitted); see also In re Elkins, 144 Cal.App.4th 475, 499, 50 Cal.Rptr.3d 503
> (Cal. Ct. App. 2006) (holding that the 'governor, in reviewing a suitability
> determination, must remain focused...on facts indicating that release currently
> poses 'an unreasonable risk of danger to society'" (citing Cal. Code Regs. tit.
> 15, § 2402(a))); Scott, 133 Cal.App.4th at 591 ('The factor statutorily required
> to be considered and the overarching consideration, is "'public safety.'" (citing
> Cal. Penal Code § 3041(b))" (emphasis and ellipses in original).

While it may be argued that Hayward v. Marshall is only "dicta,"

that dicta is instructive authority in the Ninth Circuit. That

instruction being that parole suitability turns on two factors:

(1) time, has the prisoner served his minimum term?; and (2)

rehabilitation, is there any evidence that the prisoner is not

rehabilitated and would therefore be a current threat to society?

(McCarns v. Dexter, ___ F.Supp.2d ___, (C.D. Cal. 2008), 2008 WL

360827, *13, factual predicate is satisfied when prisoner has served

minimum term; legal predicate is satisfied when prisoner is

rehabilitated.

In that Petitioner's commitment offense, nor his prior criminal

history, will ever change, as articulated by the United States Supreme

Court: "The decision turns on...primarily what a man is and what
he may become rather than simply what he has done" (Greenholtz, 442
U.S., at 10, supra); moreover, "[i]t is important that we not overlook
the ultimate purpose of parole which is a component of the long-range
objective of rehabilitation" (Id., at 13). Thus, "[t]he behavior
record of an inmate during confinement is critical in the sense that
it reflects the degree to which the inmate is prepared to adjust
to parole release" (Id., at 15). The Supreme Court also recognized
that a prisoner "may become eligible for discretionary parole when
the minimum term, less good time credits, has been served" (Id.,
at 4). The factual predicate is time, while the legal predicate
is rehabilitation. Rehabilitation, of course, being the ultimate
determining factor. This is the Greenholtz doctrine: time, and
rehabilitation, equal parole.

Petitioner satisfied his minimum term on February 27, 1997 (see
EXHIBIT 3, ¶ 1, "minimum eligible parole date"), calendar years
plus custody credits. Petitioner met his 15 calendar years on or
about January 8, 2003. Each of the three times Petitioner was found
suitable for parole his net term was fixed at 188 months/13 years,
he is currently 8 years beyond his release date.

The Governor writes: Petitioner's "prison misconduct record
is equally unacceptable. .... Mr. Edward's' extensive adult criminal
record and his continued failure to live within the rules of his
environment in prison -- particularly given the violent and aggressive
nature of some of his conduct -- weigh heavily against his parole
suitability" (EXHIBIT 2, pp. 2-3). The reasoned state court decision,
affirmed by the California Supreme Court, reversed the Governor on

his reliance on postconviction conduct (EXHIBIT 1, p. 2 ["the Court finds there is no evidence on the record to support a finding of unsuitability based on Petitioner's institutional behavior, under Calif. Code Regs., tit. 15, §2402, subd. (c)(6)"]). Thus, the only factor weighing in the balance is Petitioner's prior criminal history. With the commitment offense and postconviction behavior removed from the scales, how "heavily" can Petitioner's preconviction history weigh? Especially when that preconviction history is nearly a quarter of a century old.

The Ninth Circuit warned: "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes" (Irons v. Carey, 505 F.3d 846, 854 (9th Cir. 2007); Hayward v. Marshall, 512 F.3d, at 545, supra). While the Governor's "reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can initially be justified as fulfilling the requirements of state law[,] [¶] "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and prior criminal history, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation" (Biggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003); In re Roderick, 154 Cal.App.4th 242, 276 (2007)). Thus, after serving the minimum term of the sentence, satisfying the factual predicate, suitability turns on the legal predicate, rehabilitation (McCarns v. Dexter, 2008 WL 360827, *13, supra). Unquestionably, Petitioner has satisfied both prongs and any further

- 15 -

imprisonment serves no legitimate penological interest.

## C O N C L U S I O N

It is respectfully requested that the Court issue an ORDER for the respondent to show cause why the writ should not be granted, and in doing so, in that the state courts have already held the commitment offense is not "some evidence" of unsuitability, the respondent not make conclusory statements, but make a "rational connection" between Petitioner prior criminal history and his CURRENT threat to the public; that is, how do his prior convictions rise to the "gravity" contemplated in the intent and spirit of Penal Code § 3041(b): "timing and gravity of current or past convicted offense or offenses"; and, in that Petitioner has exceeded his uniform term for the gravity of his commitment offense and its threat to public safety by 8 plus years, why he should not be discharged (Martin v. Marshall, 448 F.Supp.2d 1143, 1145 (N.D. Cal. 2006); Cal. Code Regs., tit. 15, § 2345).

DATED: _March 31, 2008_

Respectfully submitted,

_Cornelius Edwards_
Cornelius Edwards
Petitioner in pro se

- 16 -

# EXHIBIT 1

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### DEPT 100

| Date: | OCTOBER 2, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004708

In re,
CORNELIUS EDWARDS,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on May 21, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Governor in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's finding that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for parole. Cal. Code Reg. tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).

The Petitioner was received in the Department of Corrections on January 18, 1988 after a conviction for murder in the second degree. He was sentenced to 15 years to life. His minimum parole eligibility date was February 27, 1997.

The record reflects that on February 1, 1987, the Petitioner was involved in a dispute over drug dealing territory with the victim, Daryl Bradley. The victim confronted the Petitioner with a gun and threatened him. The Petitioner left and was unharmed. Later, the Petitioner went to a house where he was told that the victim had been previously looking for him and that he was armed. The Petitioner told someone that if the victim returned he may have to "take him". The victim did return and began arguing with the Petitioner and threatened him. The Petitioner took his gun from his waistband and held it behind his back. The victim then advanced on the Petitioner and the Petitioner shot the victim in the head, killing him.

The Governor is constitutionally authorized to make "an independent decision" as to parole suitability. See *Rosenkrantz, supra*, 29 Cal.4th 616, 670. Only a "modicum of evidence" is required. *Id.* at 677. Here, the Governor reversed the Board of Parole Hearings ("Board") decision to grant the Petitioner parole because he determined that the commitment offense demonstrated evidence of premeditation, because he had a previous record of violence, and because he had five serious 115 disciplines throughout his incarceration.

The Governor can properly rely upon the circumstances of the crime in deciding that petitioner is not presently suitable for parole. *Rosenkrantz, supra*, 29 Cal.4th 616, 683. However, the Court finds that there is no evidence to support the Governor's finding that the Petitioner's commitment offense was especially heinous because it was premeditated. Cal. Code Regs., tit. 15, §2402, subd. (c). Although the Petitioner spoke about the possibility of having to "take" the victim after hearing that the victim was armed and had been looking for him, he did not shoot the victim until after the victim confronted him, threatened him, and advanced on him. Further,

1

Minutes Entered
10-02-07
County Clerk

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### DEPT 100

| Date: | OCTOBER 2, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) |
|---|---|
| BH 004708 | |
| In re, | |
| CORNELIUS EDWARDS, | Counsel for Petitioner: |
| Petitioner, | |
| | Counsel for Respondent: |
| On Habeas Corpus | |

there is no evidence in the record that suggests that the Petitioner knew the victim would be at the house when he decided to go there, or that he was carrying the gun for that purpose. Therefore, there is in evidence on the record to support the Governor's finding that the murder was premeditated.

The Court finds that there is some evidence to support the Governor's finding that the Petitioner has a previous record of violence. Cal. Code Regs., tit. 15, §2402, subd. (c)(2). Among his many prior convictions, the Petitioner was convicted of exhibiting a deadly weapon, assault with a deadly weapon, and battery.

The Governor also considered the Petitioner's five 115 disciplines, the last of which was an administrative 115 in 1996. Although the Governor notes that one of the 115s was for fighting and one was for possessing a sharpened metal device, there is nothing in the record before the Court that indicates what the 115s were for. Therefore, the Court finds that there is no evidence on the record to support a finding of unsuitability based on the Petitioner's institutional behavior, under Cal. Code Regs., tit. 15, §2402, subd. (c)(6).

The Governor's decision may be upheld, despite flaws in his findings, if it is clear he would have reached the same decision even absent the errors. See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100. Here, it appears the Governor would have denied parole based on the Petitioner's previous record of violence, as he noted that the Petitioner's "extensive adult criminal record...weigh[s] heavily against his parole suitability at this time." As indicated in *Rosenkrantz, supra, 29* Cal..4th 616, 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence that demonstrates suitability for parole, as long as there is some evidence to support the finding of unsuitability. See also, *In re Jacobson,* (2007) -- Cal.App.4th --, 65 Cal.Rptr.3d 222, 229; and *In re Hyde* (2007) -- Cal.App.4th --, 65 Cal.Rptr.3d 162, 172.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

2

| Minutes Entered |
|---|
| 10-02-07 |
| County Clerk |

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | OCTOBER 2, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004708

In re,
CORNELIUS EDWARDS,
       Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Cornelius Edwards
D-74803
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

State of California - Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely



3

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br><br>CORNELIUS EDWARDS | OCT 1 5 2007<br><br>Clerk<br>By _____, Deputy<br>Joseph M. Pulido |
| | CASE NUMBER: |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | BH004708 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time
☐ Order to Show Cause
☐ Order for Informal Response
☐ Order for Supplemental Pleading

☑ Order re: Petition for Writ of Habeas Corpus
☐ Order      Petition
☐ Order re:
☐ Copy of Petition for Writ of Habeas Corpus /Suitability
Hearing Transcript for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

October 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: Joseph M. Pulido ____, Clerk
Joseph M. Pulido

Cornelius Edwards
D-74803
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

State of California - Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

COURT OF APPEAL - SECOND DIST.

F I L E D

JAN 1. 7 2008

JOSEPH A. LANE _____ Clerk

D. SANDERS _____ Deputy Clerk

| | |
|---|---|
| In re | B203890 |
| CORNELIUS EDWARDS | (Super. Ct. No. BH004708) |
| on | (Peter Espinoza, Judge) |
| Habeas Corpus. | **O R D E R** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed November 27, 2007. The petition is denied. The record submitted reflects some evidence to support the challenged decision. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071, 1080; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664-665.)

TURNER, P.J.            ARMSTRONG, J.            MOSK, J.

Court of Appeal, Second Appellate District, Div. 5 - No. B203890
**S160334**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CORNELIUS EDWARDS on Habeas Corpus

The petition for review is denied.

**SUPREME COURT**
**FILED**

MAR 1 9 2008

**Frederick K. Ohlrich Clerk**

Deputy

GEORGE

Chief Justice

# EXHIBIT 2



## OFFICE OF THE GOVERNOR

April 6, 2007

*<u>Via Facsimile and U.S. Mail</u>*

Mr. Cornelius Edwards, D-74803
*Correctional Training Facility*
CFED – 157L
Post Office Box 686
Soledad, California  93960

Dear Mr. Edwards:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to <u>reverse</u> the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

LOUIS MAURO
Chief Deputy Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**CORNELIUS EDWARDS D-74803**
**SECOND-DEGREE MURDER**

**AFFIRM:** _____

**MODIFY:** _____

**REVERSE:** _____**X**_____

On February 1, 1987, Cornelius Edwards shot to death 28-year-old Darryl Bradley, a man to whom Mr. Edwards owed a drug debt. That evening, according to the Court of Appeal opinion, Bradley visited Wardell Jackson and Charline Baines at Baines' house. He had a pistol in his hand and was with Ronald Hosey. Bradley left Baines' house and, approximately 30 minutes later, Edwards arrived at the house. Someone told Edwards that Bradley was looking for him. Edwards, Jackson and others sat in the kitchen talking and smoking cocaine. Edwards got up several times and looked out a window. He said that if Bradley came back, he may have "to take him."

Later that evening, Bradley and Hosey returned to Baines' house. Bradley was reportedly unarmed at the time. When Bradley entered the house, he and Edwards shouted at each other. A witness saw Edwards move his hand toward his belt, where he kept a gun. Bradley called Edwards a punk. Bradley and Edwards were within a couple of feet of each other and Bradley was advancing upon Edwards. Edwards then shot Bradley just above the left eye from a distance of no more than one foot away.

A police detective subsequently went to Baines' house and saw that Bradley's left front pocket was turned inside out and some coins were near his pocket. Although a witness said that Bradley had three grams of cocaine, $300 in his left pocket, wore a gold chain, and carried a wallet, none of these items were found on Bradley's body.

Cornelius Edwards was arrested more than one month later. Following a court trial, he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life in prison for murder. The court stayed the firearm enhancement. The judgment was affirmed on appeal.

I considered various positive factors in reviewing whether Mr. Edwards is suitable for parole at this time. Mr. Edwards made efforts in prison to enhance his ability to function within the law upon release. He earned a GED, took emergency management institute and business courses, and he took courses related to infectious diseases. He completed vocational training in electrical work, and he has an electrician's license. He is also a certified customer service specialist. He held various institutional jobs with the Prison Industries Authority, and he worked as a tutor, teacher's aide, clerk, and journeyman electrician. He availed himself of an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Entrepreneurship, Parent

Education Program, Effective Discipline, Parental Anger, Father/Child Relationships, Amer-I-Can, Impact, Anger Management, Cage Your Rage, Family Effectiveness Training, People in Progress, Time Out, Men's Advisory Council, and Community Re-entry, in addition to individual study courses.

Furthermore, Mr. Edwards received favorable evaluations from various correctional and mental-health professionals over the years. He also maintains seemingly solid relationships and close ties with supportive family and friends, and he received supportive letters from Mr. Bradley's sister and daughter. In addition, although I expressed concern in my 2003 decision about Mr. Edwards' parole plans, he now plans to live with his wife in Los Angeles County, the county of last legal residence, and he has several job offers, including an offer to work as an account executive for his brother-in-law's financial consulting business.

Despite the positive factors I considered, the second-degree murder for which Mr. Edwards was convicted was especially heinous because there is evidence that he premeditated on some level to kill Mr. Bradley. According to the Court of Appeal opinion, Mr. Edwards knew that Mr. Bradley was looking for him, and he said he may have "to take him." When Mr. Bradley later returned to Ms. Baines residence, Mr. Edwards, according to the October 22, 1999 letter that Mr. Edwards wrote to Mr. Bradley's daughter, told Ms. Baines that he would "probably have to shoot" Mr. Bradley or Mr. Hosey. Mr. Edwards told the 2006 Board that when Ms. Baines opened the door, he took his gun out and held it behind his back. According to the sentencing court, there was no provocative conduct on the part of Mr. Bradley at that time. Nonetheless, as Mr. Edwards wrote further in his letter to Mr. Bradley's daughter, "I intentionally aimed my weapon and fired one fatal to [sic] his head area." The gravity of the second-degree murder committed by Mr. Edwards is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

When he committed this crime, Mr. Edwards was 26 years old. According to the sentencing court, he "suffered numerous prior convictions and these convictions are of increasing seriousness and also reflect a pattern of violent conduct." As a juvenile, Mr. Edwards was arrested, but apparently not adjudicated, for possession of a dangerous weapon and assault with a deadly weapon. As an adult, he was convicted for possession of a controlled substance, exhibiting a firearm, carrying a loaded firearm in public, battery, sale of a substance in lieu of a controlled substance, and shooting at an inhabited dwelling. According to the sentencing court, he was on probation for the latter offense at the time of the murder. Mr. Edwards was also arrested, but not convicted, for carrying a loaded firearm in public, assault with a deadly weapon, being under the influence of a controlled substance, murder, robbery, and giving false information to a peace officer. In addition, he used marijuana, PCP and cocaine prior to the life offense, and he admitted to the 2006 Board that he sold drugs prior to the life offense.

Mr. Edwards' prison misconduct record is equally unacceptable. During his incarceration for the life offense, Mr. Edwards was disciplined five times for rules violations, including violations involving fighting, conspiring to introduce and traffic marijuana in the prison and possession of a

Cornelius Edwards, D-74
Second-Degree Murder
Page 3

sharpened piece of metal. He was also counseled four times for minor misconduct, most recently in 1996. Mr. Edwards' extensive adult criminal record and his continued failure to live within the rules of his environment in prison — particularly given the violent and aggressive nature of some of his conduct — weigh heavily against his parole suitability at this time.

I note that the Los Angeles County District Attorney's Office and the Los Angeles Police Department registered opposition to parole with the 2006 Board based on the gravity of the offense and Mr. Edwards' prior criminal record.

At age 46 now, after being incarcerated for approximately 20 years, Mr. Edwards made some creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the negative factors weighing against Mr. Edwards' parole suitability presently outweigh the positive ones. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Edwards.

Decision Date:    3/27/2007

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT 3

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

☒ **PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison.................................................................. _228_ Months

_-171622o_ _____ / ____ _under 18226 2nd_
Case #                    Count #                    Offense

B.  Time for using a weapon.................................................. + _12_ Months

C.  Time for other crimes..................................................... + _____ Months

_____      _____      _____      _____
Case #                    Count #                    Offense       Months

_____      _____      _____      _____
Case #                    Count #                    Offense       Months

_____      _____      _____      _____
Case #                    Count #                    Offense       Months

D.  Total term.......................................................... = _240_ Months

E.  Time credit from  _1-8 88_  to  _11 8 06_   -   _52_ Months
                    (Life term start date)   (Date of hearing)

F. .................................................................. = _188_ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

**HEARING PANEL**

Name _____              Date _____

Name _____              Date _____

Name _____              Date _____

NAME                    CDC#                    PRISON                    DATE

**BPT 1005(a)**(REV. 01/02)                              Distribution: White –C. File
                                                          Canary- BPT
                                                          Pink- Prisoner

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )    CDC Number: D-74803
Hearing of: )
)
CORNELIUS EDWARDS )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 8, 2006

3:36 p.m.

PANEL PRESENT:

Edward Martinez, Presiding Commissioner
John Nuga, Deputy Commissioner

OTHERS PRESENT:

Cornelius Edwards, Inmate
Marian Tardiff, Attorney for Inmate    .
Brian Bushling, Deputy District Attorne
Correctional Officer Unidentified·    ·

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No              See Review of Hearing
_____ Yes             Transcript Memorandum

**V. Oliver    Northern California Court Reporters**

ii

INDEX

Page

Proceedings ................................................ 1

Case Factors ............................................. 10

Pre-Commitment Factors .................................. 24

Post-Commitment Factors ................................. 37

Parole Plans ............................................ 37

Closing Statements ...................................... 58

Recess .................................................. 72

Decision ................................................ 73

Adjournment ............................................. 81

Transcriber Certification ............................... 82

--oOo--

1

1           **P R O C E E D I N G S**

2           **DEPUTY COMMISSIONER NUGA:**   Okay.   We're on the

3       record.

4           **PRESIDING COMMISSIONER MARTINEZ:**   This is a

5       subsequent parole consideration hearing for Cornelius

6       Edwards, CDC number D, as in David, 74803.   Today's

7       date is November 8th of 2006, the time is 3:36 p.m., and

8       we're located at CTF Soledad.   The inmate was received

9       on January the 8th, 1988, from Los Angeles County.   Life

10      term began on January 8th, 1988.   Minimum eligible

11      parole date is February the 27th, 1997.   The controlling

12      offense for which the inmate has been committed is

13      murder, second degree.   In the case number A, as in

14      Adam, 796730, count one, Penal Code Section 187.

15      Inmate received a term of 15 years to life.   This

16      hearing is being tape-recorded for purposes of voice

17      identification.   Each of will state our first name,

18      last name, spelling our last name.   When it comes to

19      you, sir, please spell your last name and provide your

20      CDC number.   I'll start with myself, move to the left,

21      Ed Martinez, M-A-R-T-I-N-E-Z, Commissioner.

22          **DEPUTY COMMISSIONER NUGA:**   John Nuga, N-U-G-A,

23      Deputy Commissioner.

24          **DEPUTY DISTRICT ATTORNEY BUSHLING:**   Brian

25      Bushling, B-U-S-H-L-I-N-G, representing the LA County

26      DA's Office.

27          **ATTORNEY TARDIFF:**   Marian Tardiff, T-A-R-D-I-F-

2

1    F, attorney for Mr. Edwards.

2        **INMATE EDWARDS**: Cornelius Edwards, E-D-W-A-R-D-

3    S, D, as in David, 74803.

4        **PRESIDING COMMISSIONER MARTINEZ**: All right.

5    I'd like to note for the record that there are two

6    correctional officers present for security purposes who

7    will not be participating in today's hearing. Mr.

8    Edwards, could you read the ADA statement aloud?

9        **INMATE EDWARDS**:

10           "The Americans With Disabilities Act.

11           The Americans With Disabilities Act,

12           ADA, is a law to help people with

13           disabilities. Disabilities are

14           problems that make it harder for some

15           people to see, hear, breathe, talk,

16           walk, learn, work, or take care of

17           themselves than it is for others.

18           Nobody can be kept out of public places

19           or activities because of a disability.

20           If you have a disability you have the

21           right to ask for help, to get ready for

22           a BPT hearing, get to the hearing,

23           talk, read forms and papers, and

24           understand the hearing process. BPT

25           will look at what you ask for to make

26           sure that you have a disability that is

27           covered by the ADA, and that you have

1           asked for the right kind of help.  If

2           you do not help, if you do not get

3           help, or if you don't think you got the

4           kind of help you need ask for a BPT

5           1074 Grievance Form.  You can also get

6           help to fill it out."

7           **PRESIDING COMMISSIONER MARTINEZ:**  All right.  Do

8    you understand those rights, sir?

9           **INMATE EDWARDS:**  Yes, I do, sir.

10          **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  You

11   signed the BPT 1073 on June 13, 2005, and then

12   indicating you do not have a disability as defined

13   under the Americans With Disabilities Act.  Is that

14   information still correct?

15          **ATTORNEY TARDIFF:**  Yes, sir.

16          **PRESIDING COMMISSIONER MARTINEZ:**  All right.

17   Okay.  And do you have any problems walking up and down

18   steps?

19          **INMATE EDWARDS:**  No, sir.

20          **PRESIDING COMMISSIONER MARTINEZ:**  Any problems

21   walking a distance of over a hundred yards?

22          **INMATE EDWARDS:**  No, sir.

23          **PRESIDING COMMISSIONER MARTINEZ:**  No problems

24   sitting here for this hearing today?

25          **INMATE EDWARDS:**  No, sir.

26          **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  Any

27   reading problems?

4

1       **INMATE EDWARDS:**  I did wear glasses, I broke

2    them about three months ago, it's kind of hard for me

3    to get them replaced, the process takes a while.

4       **PRESIDING COMMISSIONER MARTINEZ:**  All right.  I

5    know you read that.

6       **INMATE EDWARDS:**  Yeah, I'm fine, I can.

7       **PRESIDING COMMISSIONER MARTINEZ:**  Didn't need a

8    magnifying device?

9       **INMATE EDWARDS:**  Not a problem.

10      **PRESIDING COMMISSIONER MARTINEZ:**  All right,

11   good.  Do you have any hearing impairments?

12      **INMATE EDWARDS:**  No, sir.

13      **PRESIDING COMMISSIONER MARTINEZ:**  All right.

14   Have you ever been included in any triple CMS or EOP?

15      **INMATE EDWARDS:**  No, sir.

16      **PRESIDING COMMISSIONER MARTINEZ:**  Do you know

17   what those are?

18      **INMATE EDWARDS:**  Yes, sir.

19      **PRESIDING COMMISSIONER MARTINEZ:**  Can you tell

20   me, please?

21      **INMATE EDWARDS:**  Triple CMS I believe is if

22   you're on psych meds.

23      **PRESIDING COMMISSIONER MARTINEZ:**  Have you ever

24   been on psychiatric medication?

25      **INMATE EDWARDS:**  No, sir.

26      **PRESIDING COMMISSIONER MARTINEZ:**  On the street

27   anything?

5

1    **INMATE EDWARDS:**  No, sir.

2    **PRESIDING COMMISSIONER MARTINEZ:**  As far as

3    education, how far did you get in school out on the

4    street?

5    **INMATE EDWARDS:**  I graduated from high school,

6    one year in college.  I went to a career college after

7    that to earn a vocation in accounting.

8    **PRESIDING COMMISSIONER MARTINEZ:**  Yeah, right.

9    **INMATE EDWARDS:**  Then I stopped about that time.

10   **PRESIDING COMMISSIONER MARTINEZ:**  Do you suffer

11   from any disabilities that would prevent you from

12   participating in today's hearing?

13   **INMATE EDWARDS:**  No, sir.

14   **PRESIDING COMMISSIONER MARTINEZ:**  All right.

15   Counsel, have we met all Mr. Edwards ADA rights?

16   **ATTORNEY TARDIFF:**  Yes.

17   **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  We will

18   move forward with this and we're going to go ahead and

19   cover these areas.  All right.  This hearing is being

20   conducted according to Penal Code Section 3041, 3042,

21   and the Rules and Regulations of the Board of Prison

22   Terms governing parole consideration hearings for life

23   inmates.  The purpose of today's hearing is to once

24   again consider the number and the nature of the crimes

25   you were committed for, your prior criminal and social

26   history, your behavior and programming since your

27   commitment.  You've had the opportunity to review your

6

1    central file and prior transcript and you will be given

2    the opportunity to correct or clarify that record.

3    We'll reach a decision today and inform you whether or

4    not we find you suitable for parole and the reasons for

5    our decision.  If you are found suitable for parole the

6    length of your confinement will be explained to you.

7    Again, nothing that happens here today will change the

8    findings of the court.  The Panel is not here to retry

9    your case, the Panel is here for the sole purpose of

10   determining your suitability for parole.  Do you

11   understand that, sir?

12          **INMATE EDWARDS:**  Yes, I do.

13          **PRESIDING COMMISSIONER MARTINEZ:**  The hearing

14   will be conducted in two phases, and I will discuss

15   with you the crime for which you were committed, your

16   prior criminal and social history.  Commissioner Nuga

17   will discuss with you your progress since your

18   commitment, your counselor reports, and your

19   psychological evaluations, as well as parole plans, any

20   letters of support that you, have as well as letters of

21   opposition in the file.  Once that's concluded the

22   Commissioners, the District Attorney, and your attorney

23   will be given the opportunity to ask you questions,

24   questions from the District Attorney shall be asked

25   through the Chair and you will direct your answers to

26   the Panel.  Next, the District Attorney, then your

27   attorney, then you will be given an opportunity to make

7

1    a final closing statement regarding your parole

2    suitability.  And your statement should address why you

3    feel you're suitable for parole.  The Panel will then

4    recess to deliberate and once the deliberations are

5    complete the Panel will resume the hearing and announce

6    its decision.  The California Code of Regulations

7    states that regardless of time served a life inmate

8    shall be found unsuitable for and denied parole if in

9    the judgment of the Panel the inmate would pose an

10   unreasonable risk of danger to society if released from

11   prison.  You have certain rights, and those rights

12   include a timely written notice of this hearing, the

13   right to review your central file, and the right to

14   present whatever documents.  Counsel, have those rights

15   been met?

16          **ATTORNEY TARDIFF:**  Yes.

17          **PRESIDING COMMISSIONER MARTINEZ:**  You have an

18   additional right to be heard by an impartial Panel.

19   Mr. Edwards, do you have any objections to the Panel

20   that sits before you today?

21          **INMATE EDWARDS:**  No, sir.

22          **PRESIDING COMMISSIONER MARTINEZ:**  No.  Counsel?

23          **INMATE EDWARDS:**  I did have one concern and I

24   think my attorney cleared it up for me.  But just for

25   purposes of the record I was just found suitable for

26   parole on June 8th.

27          **PRESIDING COMMISSIONER MARTINEZ:**  Right.

8

1        **INMATE EDWARDS:**  And because of a malfunction
2   I'm here again today, and for some reason I was under
3   the impression that I would be before the same Panel,
4   and if not the same Panel a minimum of one Panel
5   member, and that didn't happen today.  From what I
6   understand, if I'm correct, and I need to know, if it's
7   a new hearing I don't have a right to a new Panel.  If
8   it's a re-hearing is there a difference between a re-
9   hearing and a new hearing, in my circumstances?

10       **PRESIDING COMMISSIONER MARTINEZ:**  Again, in
11  regards to this time what they do is they do their best
12  to try to accommodate with regards to trying to get at
13  least one of the Panel members, whether it's the
14  Commissioner or Deputy Commissioner to be involved in
15  the hearing.  In this case, again, they try to make
16  every attempt to do that.  In this particular case they
17  were not able to.  So, therefore, now we're here with
18  this and as I explained to your counsel about it, we'll
19  move forward with it and considering what was done in
20  the previous Panel we'll make our decision.

21       **INMATE EDWARDS:**  Thanks.

22       **PRESIDING COMMISSIONER MARTINEZ:**  All right.
23  Okay.  Again, you will receive a written copy of the
24  tentative decision today, and that decision becomes
25  effective within 120 days.  A copy of that decision and
26  a copy of that transcript will be sent to you.  And
27  also the Board having eliminated its appeal process, so

9

1    therefore if you disagree with anything in today's

2    hearing you have a right to go directly to the court

3    with your complaint.  And you're not required to admit

4    to your offense or discuss your offense today, however,

5    the Panel does accept the findings of the court to be

6    true.  Do you understand that, sir?

7         **INMATE EDWARDS:**  Yes, sir.

8         **PRESIDING COMMISSIONER MARTINEZ:**  Commissioner

9    Nuga, is there any confidential material?

10         **DEPUTY COMMISSIONER NUGA:**  No.

11         **PRESIDING COMMISSIONER MARTINEZ:**  All right.

12    We'll pass the checklist to make sure we're all working

13    with the same documents.

14         **ATTORNEY TARDIFF:**  I have these documents and

15    I've submitted some more documents.

16         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.

17         **ATTORNEY TARDIFF:**  Nothing further.

18         **PRESIDING COMMISSIONER MARTINEZ:**  Mark that

19    Exhibit 1.  Any preliminary objections, Counsel?

20         **ATTORNEY TARDIFF:**  No.

21         **PRESIDING COMMISSIONER MARTINEZ:**  All right.

22    With that we may proceed.  Will Mr. Edwards be speaking

23    with the Panel today?

24         **ATTORNEY TARDIFF:**  Yes.

25         **PRESIDING COMMISSIONER MARTINEZ:**  In all

26    matters?

27         **ATTORNEY TARDIFF:**  Yes.

10

1      **PRESIDING COMMISSIONER MARTINEZ:** All right,

2      very well. Mr. Edwards, please raise your right hand.

3      Do you solemnly swear or affirm that the testimony you

4      will give this hearing will be the truth and nothing

5      but the truth?

6      **INMATE EDWARDS:** I do, sir.

7      **PRESIDING COMMISSIONER MARTINEZ:** Counsel, if

8      there are no objections I'm going to reference the

9      statement of facts from the Appellate decision.

10      **ATTORNEY TARDIFF:** No objection.

11      **PRESIDING COMMISSIONER MARTINEZ:** That will go

12      from page 2 through -- and I'm going to start what's

13      the middle of --

14      "February 1st, 1987, Wardell (phonetic)

15      Jackson, at the home of his friend

16      Charlene Baines (phonetic), twice during

17      that evening Daryl Bradley (phonetic)

18      visited. On the first occasion he had a

19      pistol in his hand, was with Ronald

20      Posey (phonetic). Approximately 25 to

21      30 minutes after Bradley first left the

22      appellant arrived. Somebody told

23      appellant something to the effect that

24      Bradley had been by earlier looking for

25      him. Appellant Jackson and others were

26      present at Baines' house, sat in the

27      kitchen talking and smoking cocaine.

11

| | |
|---|---|
| 1 | Prisoner got up quiet a few times and |
| 2 | looked out a window.  Appellant stated |
| 3 | that if Bradley came back Appellant may |
| 4 | have to take him.  Later that evening |
| 5 | Bradley and Posey returned to Baines' |
| 6 | house, when Bradley and Posey entered |
| 7 | the kitchen, Bradley and appellant began |
| 8 | to shout.  Jackson saw appellant move |
| 9 | his hand to his belt where his gun was |
| 10 | located.  Bradley called appellant a |
| 11 | 'punk,' Bradley and appellant were |
| 12 | within a couple of feet of each other |
| 13 | and Bradley was advancing upon |
| 14 | appellant.  Less than two seconds after |
| 15 | Jackson saw appellant reach for his gun |
| 16 | Jackson turned to leave and heard a |
| 17 | gunshot.  Bradley died as the result of |
| 18 | the gunshot wound to the head fired at a |
| 19 | maximum of 12 inches from the point of |
| 20 | entry.  February 2nd of 1987, Los Angeles |
| 21 | Police Detective Bernardo Lovato |
| 22 | (phonetic) went to the location of the |
| 23 | shooting, observed Bradley slumped on |
| 24 | the floor with what appeared to be a |
| 25 | bullet wound just above the left eye. |
| 26 | Victim's left pocket had been turned |
| 27 | inside out with some coins in the area |

1        of his pockets, and no cash. Also note

2        that two sections, number one, when

3        Bradley and Posey returned Jackson did

4        not see a gun; and number two, Jackson

5        testified that he could not remember for

6        sure that he told Detective Bernardo

7        Lovato that he saw Bradley advancing on

8        appellant."

9        It continues on,

10       "No cash, cocaine, wallet or gold chain

11       was found on the victim's body.

12       Detective Lavato searched the location

13       for a gun but none was found.   The

14       following day Detective Lovato

15       interviewed Posey at the police station,

16       Posey told Detective that Bradley had

17       furnished cocaine to appellant to sell

18       and appellant never paid for the cocaine.

19       Posey also stated that on February 1st he

20       and Bradley were trying to locate

21       appellant to get the money, when they met

22       appellant, appellant left saying he had

23       some jewelry he would sell to pay the

24       debt and would return.   Posey said that

25       Bradley was holding an unloaded gun, but

26       was not pointing it at anyone.

27       Approximately 15 minutes later -- 15

13

1          minutes after appellant left Posey,
2          Bradley left and went to Baines' house.
3          Upon arrival they walked into the
4          kitchen, saw appellant standing in the
5          kitchen smoking some cocaine. Posey said
6          that's when appellant saw Bradley,
7          appellant pulled out a gun from his waist
8          and pointed it at Bradley. Bradley then
9          said, 'I'll take that gun,' at which time
10         appellant shot Bradley in the face.
11         Posey indicated he was in the kitchen
12         when the shooting took place. Posey said
13         that Bradley did not have a gun, and
14         prior to arriving at Baines' residence
15         Bradley had given the gun to a person
16         called Nut (phonetic). Posey said that
17         at the time Bradley went to Baines'
18         residence, Bradley had three grams of
19         cocaine on his person and $300 in his
20         left pants pocket and was wearing a gold
21         chain with a lion's head, a watch with a
22         black band, and was carrying a brown
23         wallet."

24         That pretty much concludes it, taken from the
25  statement of facts, and again. All right. Let's just
26  move forward, let's just go as far as with this crime,
27  Mr. Edwards, as I read it is that pretty accurate to

14

1    what occurred?

2        **INMATE EDWARDS:** The shooting, yes. I think the
3    reason and the motive are not true. I've said this
4    time and time again, if you like I can explain better
5    in a little more detail. The dispute between me and
6    Bradley wasn't something I owed him, I never owed him
7    any money. The dispute was behind drugs and who would
8    sell drugs in this particular area. He had some
9    (inaudible), he ran with a little Crip gang over there,
10   and they happened to be guys I knew that were young and
11   I knew them and I said to them one day this guy didn't
12   have any business over there, one of you guys have to
13   (inaudible). Well, it got back to him. When it got
14   back to him --

15       **PRESIDING COMMISSIONER MARTINEZ:** Why did you
16   say that?

17       **INMATE EDWARDS:** Because, number one, he killed
18   a guy over there, prior to that, three or four years
19   prior to that, a friend of ours whose name was Dondi
20   Parker (phonetic), they were shooting guys, and Dondi
21   caught the guys and they said he didn't catch the guys,
22   and one thing led to another and Dondi didn't apologize
23   to him. Well, about a week later he pulls up and he
24   gotten in my car, but he tells Dondi to get on his
25   knees and apologize, but Dondi doesn't apologize and he
26   shoots him five times. He went to court and beat the
27   case. But at the same token he was a part of this

15

1    group, but he didn't live in this area. So when I said
2    that to the group to his friends I was indicating that
3    you shouldn't let this guy come down here, he doesn't
4    belong down here, doesn't live down here, you shouldn't
5    let him come down here.

6          **PRESIDING COMMISSIONER MARTINEZ:**  This was in
7    reference to dealing drugs in that area?

8          **INMATE EDWARDS:**  No, it wasn't in reference to
9    dealing drugs, it was in reference to him not being
10   down there at all. But because we were both selling
11   drugs I think he took that as who are you to tell me
12   where I can go and what I can do. On the night of the
13   actual incident I had got a phone call from a friend
14   who used to steal jewelry and sell it to me. I went
15   down to (inaudible) Village where it was happening to
16   meet him, I have a sister who lived down there, when I
17   went to my sister's as I pulled up Ronald Posey was
18   standing in the middle of the street. I parked, I got
19   out of the car, Ronald said, 'Hey man, Tony's over here
20   he wants to talk to you.' I said, 'All right, just
21   give me a few minutes, I need to take care of
22   something.' I looked over, he was arguing with a guy
23   and he's drunk, I could tell he's drunk, but he's
24   arguing with one of the guys that live over there, I
25   don't know what the argument was about but I needed to
26   go see the person I came to see. And I'm standing in
27   the doorway and I'm talking to him, and as I'm talking

16

1      to him Bradley walks in and he tells the guy that I'm
2      talking to, 'You need to leave,' and then he tells
3      Ronald to hand him the gun.  Ronald hands him the gun
4      and he blocks off the stairway, tells me, begins to
5      tell me --

6          **PRESIDING COMMISSIONER MARTINEZ:**  You're
7      watching this, observing this?

8          **INMATE EDWARDS:**  Yeah, I'm right in front of
9      him, he's talking to me, and he tells me, he says, 'Who
10     are you to tell me that I can't come over here and sell
11     drugs?'  And I see he's drunk, and I have a weapon, and
12     I take a chance and I push his hand out of the way and
13     I walk out.  I walk out, I get into my car, I drive
14     down, I tell Kinney who's the guy that came down to see
15     me to get in the car, I drive him out of the area so he
16     can go home, then I come back.  I have drugs, and the
17     reason I came down there was to deliver some drugs.
18     And so I go back, I park, and I walk over to Charlene
19     Baines' house, while I'm there they tell me, 'Hey
20     Tony's been by here looking for you, he had a gun when
21     he came,' I said, 'I know, I just saw him, and if he
22     comes in here don't open that door, you open that door
23     I might have to shoot him.'  And then seconds after I
24     said that, knock knock knock, Tony knocks on the door.
25     I say, 'Who is it?'  'It's me, open the door.'  Before
26     anything else transpires Charlene gets up, walks over
27     opens the door, when she opens the door I pulled the

17

1    gun out, I pulled it out and I'm holding it behind my
2    back.

3        **PRESIDING COMMISSIONER MARTINEZ:**  Does he see
4    it?

5        **INMATE EDWARDS:**  No, he doesn't see the gun, but
6    I'm telling him not to pull that gun out, he'd just
7    pulled a gun on me, I'm talking not 20 minutes ago, and
8    I tell him, 'Don't pull that gun out here.'  'Ah punk
9    you ain't gonna do nothing,' and he starts coming,
10   starts coming up on me and looks back at Ronald, and I
11   know Ronald was handling the gun, I told him, 'Don't
12   pull a gun,' and I said, 'Ronald, where's the gun' and
13   I --

14       **PRESIDING COMMISSIONER MARTINEZ:**  Was Ronald
15   there?

16       **INMATE EDWARDS:**  Ronald was there.

17       **PRESIDING COMMISSIONER MARTINEZ:**  Already, or
18   did he come with --

19       **INMATE EDWARDS:**  He came with Tony, they came
20   together.

21       **PRESIDING COMMISSIONER MARTINEZ:**  They both
22   entered?

23       **INMATE EDWARDS:**  They both, they both entered at
24   the same time.  And I told them not to pull a gun out,
25   and I know Ronald just handed him a gun.  I don't want
26   to take this chance and let Ronald hand him another
27   gun, and I shoot him.  My intentions that night wasn't

18

1   to shoot, to go out and find somebody to kill, it

2   wasn't that. Daryl Bradley came looking for me and I

3   thought that I was in danger at the time. I found out

4   later that the gun didn't have any bullets. I can't

5   see through it, through a barrel, I can't see through

6   it. The only thing I know is that he has a history of

7   shooting and killing people. And right now I'm one of

8   those people, and that's --

9         **PRESIDING COMMISSIONER MARTINEZ:** And so where

10  did this come off about you owning him $1,400 for --

11       **INMATE EDWARDS:** I never, I never owed him a

12  nickel. Now, let me say this to you, one night prior

13  to this maybe 2:00 or 1:00 o'clock in the morning he

14  came over to this area, and me and another friend of

15  mine were out, and he said, 'Hey man,' he said, 'I've

16  got about a half ounce and I need to dump it.' I said,

17  'Listen, I tell you what, we've got a spot over here,

18  go over there and you can do what you need to do.' And

19  what he did was he went over there, there was a couple

20  guys that actually work in there and that's what they

21  do, they sell narcotics. He let them do what they

22  needed to do, but he left. Now, when he left I went by

23  there and he said he left, and I said, 'Well, listen,

24  when he comes back make sure that you guys got his

25  money,' and when he came back they picked his money up,

26  that was the end of that. That's the only time that I

27  ever had anything to do with money being owed to him,

19

1    and it wasn't me owing him any money, it was just maybe
2    I just knew what was happening at that time.  Where
3    there's money built in, it's my opinion and it's
4    probably just as good as Ronald Posey's or anyone
5    else's, that that is hearsay.  I don't think anybody
6    every told Ronald that I owed this guy some money.  In
7    fact, I don't think that anybody else, any other
8    witnesses or anybody, unless they just were talking to
9    each other like maybe he owes him some money, I never
10   owed this guy a nickel, never.  The dispute was
11   specifically because I told his friend that he
12   shouldn't be down there, and that's what that was
13   about.

14          **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  How
15   long had you been dealing drugs before this happened?
16          **INMATE EDWARDS:**  I'd been dealing drugs a long
17   time, sir.

18          **PRESIDING COMMISSIONER MARTINEZ:**  Before it
19   happened?

20          **INMATE EDWARDS:**  Yes.

21          **PRESIDING COMMISSIONER MARTINEZ:**  How is it that
22   you managed to finish high school and go into college
23   and get somewhat of an education for yourself?

24          **INMATE EDWARDS:**  (Inaudible.)  My mother and
25   father -- I was born July 1960 in Marysville,
26   California, my mother and father from there they moved
27   to Madera, from Madera to Fresno.  For some reason my

20

1   mother got upset with my father and left, moved down to
2   Los Angeles County. In between that time my father
3   moved back to Los Angeles and found us. Well, they
4   stayed separated but my father would pick me up on the
5   weekends or when my mother got tired of me, and then
6   I'd stay with him. In turn, when I was with my mother
7   I kind of ran rampant and did what I wanted to do. I
8   mean, she would --

9       **PRESIDING COMMISSIONER MARTINEZ:** How old were
10  you then?

11      **INMATE EDWARDS:** When I was 13, 14. When I was
12  14 I got into some trouble and my father and mother
13  both agreed, saying listen, you're going to either end
14  up in prison or dead, one of the two, so what we need
15  to do is we need to get you out of Los Angeles to
16  someplace where I think you'll have a better shot, a
17  shot at having a good life. I have an uncle, his
18  name's Roy Edwards, and my aunt Janet Edwards she's not
19  living any more, but they sent me to Baltimore. I
20  lived in Baltimore from the time I was 14 until I was
21  19. I came back August of 1979, and in November of
22  1979 my father was robbed and killed outside of Del
23  Monte, the Horseshoe Casino in Gardena. After that, I
24  was working, I was going to school, but I wanted more
25  money. I wanted money and I wanted it now, and I
26  started selling drugs. I started, and that's where it
27  began, that's where it began, and every phase of

21

1    criminal activity that I was involved in from that

2    point on was related to selling narcotics.

3    **PRESIDING COMMISSIONER MARTINEZ:**  How old were

4    you when (inaudible)?

5    **INMATE EDWARDS:**  I was 26.

6    **PRESIDING COMMISSIONER MARTINEZ:**  And you

7    started at 19?

8    **INMATE EDWARDS:**  I started at 19, sir.

9    **PRESIDING COMMISSIONER MARTINEZ:**  And during

10   that time span did you hold jobs or did you just sell

11   drugs?

12   **INMATE EDWARDS:**  Yeah, I had some very good

13   jobs.  No, I had some pretty decent jobs.  I was

14   assistant sales manager for Budget Truck Rental.  I

15   ended up leaving there because I had another uncle in

16   Los Angeles who owned a liquor in El Centro, and he

17   felt more comfortable with family there.  So I moved

18   and I worked for him for maybe a year and a half, two

19   years.  I left, he got sued and lost his store, so I

20   started working for Designs Unlimited, a wholesale

21   luggage.  I did some extra work in Hollywood in movie

22   production.  I also worked for K-Mart in inventory

23   control, personnel.  At the time prior to catching this

24   case, maybe four months, five months I worked for Arco

25   Towers, I was dock master, and that's right downtown LA

26   across from Bonaventure, the Atlantic Mutual Plaza.  I

27   worked there for maybe a year, year and a half.

22

1      **PRESIDING COMMISSIONER MARTINEZ:** Did you work
2    in (inaudible)?

3      **INMATE EDWARDS:** No, I actually quit my job.

4      **PRESIDING COMMISSIONER MARTINEZ:** How long had
5    you been off work?

6      **INMATE EDWARDS:** I had stopped working for maybe
7    five months. One day I came home and my wife, she was
8    pregnant with my daughter at the time, I don't know, if
9    she was drunk but she (inaudible), and so a friend of
10   mine came by the next day and said, 'Hey man I'm on my
11   way to Vegas,' and I said okay, and I moved to Vegas
12   and I never went back to work. Although I did go back
13   and give my wife money (inaudible).

14     **PRESIDING COMMISSIONER MARTINEZ:** Looking at
15   this, now I think certainly you realize how (inaudible)
16   turned math, and looking back and looking at this, how
17   do you feel about what you did?

18     **INMATE EDWARDS:** Well, disappointed, sometimes
19   angry.

20     **PRESIDING COMMISSIONER MARTINEZ:** Disappointed
21   at who?

22     **INMATE EDWARDS:** At me, I could have done a lot
23   better. Not just that, but I have a daughter and this
24   is her third year at Northridge, and I have a step son
25   who is just finished Texas Tech, and they think that I
26   had -- and it's not just my kids but I've had a chance
27   to know the victim's family, I've spoken with Crystal,

23

1    Bradley his daughter, and I communicate with his sister

2    regularly.

3         **PRESIDING COMMISSIONER MARTINEZ:**  She initiate

4    the contact?

5         **INMATE EDWARDS:**  Yes, she did, yes, she did.  In

6    fact, I have a chrono here on the first time she made

7    contact, and I just received a Christmas card from her

8    just recently, if you'd like to read those.

9    (Inaudible.)  And then I have letters from the

10   daughter, she wrote me three times, and the first time

11   she wrote she was a little upset so I didn't respond,

12   but I took the letter to Sergeant McCall and asked him

13   to document it and I received a chrono he wrote.  And I

14   decided not to respond.  Then she had 15 questions that

15   she wanted answered.  I have other letters here too.

16   This is one from her, from his sister, this is one of

17   the letters where she actually wrote and forgave me.

18   And these are from the daughter.

19        **PRESIDING COMMISSIONER MARTINEZ:**  We'll get

20   those back to you.

21        **INMATE EDWARDS:**  Sure.

22        **PRESIDING COMMISSIONER MARTINEZ:**  (Inaudible.)

23        **INMATE EDWARDS:**  She had 15 questions that she

24   wanted me to answer, but she was, she was really upset,

25   so I didn't respond to the first one.  The second time

26   she wrote she was still really upset, so I didn't

27   respond to that one either.  But the third time she

24

1    wrote she mentioned that she was sorry and that she

2    needed closure. So I wrote a letter, I wrote her --

3         **PRESIDING COMMISSIONER MARTINEZ**: (Inaudible.)

4         **INMATE EDWARDS**: I wrote her explaining in

5    detail from the beginning. Given all those factors,

6    when I look back at what took place I wish I could have

7    did it differently.

8         **PRESIDING COMMISSIONER MARTINEZ**: At that time

9    were you also using or were you just selling?

10        **INMATE EDWARDS**: I've always been a recreational

11   drug user. I'll go out on a weekend or something and

12   somebody would say, 'Hey you want to do a line,' maybe

13   do a line. If I'm at a club I'll have a drink, but I

14   wasn't a drug addict or an alcoholic. But throughout

15   the years what I've learned is it doesn't matter

16   whether you're an alcoholic or a drug dealer or a drug

17   seller, I think the results are the same.

18        **PRESIDING COMMISSIONER MARTINEZ**: Were you under

19   the influence of anything that night --

20        **INMATE EDWARDS**: No.

21        **PRESIDING COMMISSIONER MARTINEZ**: No? As far as

22   convictions, juvenile record, you have an October '73

23   arrest for possession of a dangerous weapon, 12020

24   P.C., and there was no disposition on that. What was

25   that about, do you remember?

26        **INMATE EDWARDS**: My father, well my

27   grandfather's brother had 16 sons. To make a long

25

1    story short this is my cousin, kind of like my grand
2    cousin, he's my father's -- second cousin, he's my
3    father's cousin, but he worked for General Hospital,
4    and on his way home he would stop by my mother's house
5    and spend some time with her.  Well, generally when he
6    got paid on Fridays he'd stop by.  This particular day
7    he stopped by I was about 13 years old and I would
8    always bug him about driving his car, I just wanted to
9    drive it around the block.  And he was drunk and he
10   gave me his keys and he let me drive.  Well, I'm
11   driving around the block and remember I'm 13 years old
12   and an officer sees me sitting in the car and he pulls
13   me over.  Well, he pulls me over and checks the trunk
14   and there's a 25 automatic inside the trunk.  He takes
15   me down to the police department, calls my mom and said
16   come down and get me.

17        **PRESIDING COMMISSIONER MARTINEZ:**  Also another
18   arrest 1545, assault with a deadly weapon, June of '74.
19   You were detained on that, no further disposition on
20   that.  What was that about?

21        **INMATE EDWARDS:**  That was a -- that's the one
22   with my mother and father, after that they decided to
23   send me to Baltimore.  What happened was I had five
24   siblings, and I'm the oldest boy, wrong, four siblings
25   and I'm the oldest boy, I have a sister that's nine
26   months older than me.  One of my sisters ran in the
27   house and she was crying, she was screaming at the top

26

1    of her lungs, and I went outside and what happened is
2    one of the kids who lived by took her bike and slung it
3    in the middle of the street, and when I ran outside --
4    and my mother and nobody was there, and when I ran
5    outside we got into an argument and I grabbed a stick
6    and I hit him.

7    **PRESIDING COMMISSIONER MARTINEZ:** Seriously
8    injure him?

9    **INMATE EDWARDS:** No, I don't think, well, I hurt
10   him, I mean there wasn't no blood, but I know I hurt
11   him. He was a little bigger than me, so.

12   **PRESIDING COMMISSIONER MARTINEZ:** All right.
13   Concerning adult convictions October '79 arrest for
14   11377, possession of a controlled substance, PCP?

15   **INMATE EDWARDS:** Yes.

16   **PRESIDING COMMISSIONER MARTINEZ:** And you were
17   referred for diversion on that, but you failed to show
18   up to the probation officer, so it was in court on a
19   bench warrant, I believe was issued. August of '80 you
20   had an arrest again for 11379, sale transport of PCP.
21   Guilty for 11377, possession of PCP, you received 12
22   months probation without supervision and 18 days in
23   county jail. June of '81, carrying a loaded firearm in
24   a public place, and another firearm, this time with a
25   firearm.

26   **INMATE EDWARDS:** Just what year was that?
27   **PRESIDING COMMISSIONER MARTINEZ:** Huh?

27

1          **INMATE EDWARDS:**  What year was that, I'm sorry?

2          **PRESIDING COMMISSIONER MARTINEZ:**  June of 1981,

3     carrying a loaded firearm in a public place.  The DA

4     did reject that case, but what was that all about?

5          **INMATE EDWARDS:**  The uncle that I had involved

6     when I eventually moved to California, he bought a

7     house out in Rancho Cucamonga.  I had a brand new

8     shotgun, I had it in the backseat, and I was taking it

9     out there and I was on the San Bernardino freeway and a

10    motorcycle cop drives up besides me and he sees the gun

11    in the backseat, pulled me over.  He pulls me over and

12    there's a box of bullets right next to it.  He asked

13    me, 'Where you going?'  And I tell him I'm taking it

14    out, and he said, 'You can't have a gun and bullets,'

15    and I get arrested for it, and the DA rejected it.

16         **PRESIDING COMMISSIONER MARTINEZ:**  All right.

17    August of '81 you had a robbery, 211?

18         **INMATE EDWARDS:**  Robbery 211?

19         **PRESIDING COMMISSIONER MARTINEZ:**  211 robbery.

20         **INMATE EDWARDS:**  Okay.  That was San Diego

21    Valley, it actually it wasn't a robbery and I could

22    explain.

23         **PRESIDING COMMISSIONER MARTINEZ:**  Also

24    exhibiting a deadly weapon firearm, probation without

25    supervision.  What happened there?

26         **INMATE EDWARDS:**  Okay.  That was Myrna

27    (phonetic).  Myrna was -- a girlfriend I had been

28

1    seeing, her name was Mary, and I used to sell PCP.  I
2    sold, Myrna sold PCP, but she also used it, and she was
3    going bad and she asked me to do her a favor, can you
4    help me sell mine, I'll pay you (inaudible).  And this
5    happened a couple of times.  Well, she hadn't paid me,
6    and I told her sister Mary, I said, 'Come on let's go
7    see Myrna,' so she could pay me.  So we go out to see
8    her and Myrna doesn't have any money and she says -- so
9    I tell her, I say, 'Well, listen, I'm going to take
10   your stereo, I'm going to give it to your sister, and
11   when you take the money down there she'll give you your
12   stereo back.'  Well, I took the stereo down, and
13   actually the sister lived with her mother so everything
14   was right at the mother's house, I took it down there.
15   And I carried a weapon, I sold drugs, I used to keep a
16   weapon.  She called the police and said that I robbed
17   her, and they dropped it to I believe a brandishing a
18   deadly firearm in public, and gave me probation.

19           **PRESIDING COMMISSIONER MARTINEZ:**  All right.
20   July of '81, also again, assault with a deadly weapon
21   (inaudible), carrying a loaded firearm in a public
22   place.  Once again, assault with a deadly weapon
23   charge?

24           **INMATE EDWARDS:**  July 1981?

25           **PRESIDING COMMISSIONER MARTINEZ:**  July of '81.

26           **INMATE EDWARDS:**  (Inaudible.)

27           **PRESIDING COMMISSIONER MARTINEZ:**  That's an LA

29

1    P.D. arrest, you received 12 months probation without
2    supervision, 15 days county jail, 90 days county jail,
3    suspended sentence.   July of 1981, and I don't know if
4    this is one in the same, or what, but it also indicates
5    that in September of 1981 at 2:45 arrested assault with
6    a deadly weapon, 232 Battery, you received 12 months
7    probation without supervision (inaudible).

8         **INMATE EDWARDS**:  Yeah, I'm a little bit confused
9    here.   I think it's one and the same.  I really don't
10   recall.  Or you know what, yes, I do.

11        **PRESIDING COMMISSIONER MARTINEZ**:  It indicates
12   also indicates that this is part of the same, case
13   number's different, but anyway is a mistrial on that.
14   You went to court and they had a mistrial?

15        **INMATE EDWARDS**:  Okay.   That's --

16        **PRESIDING COMMISSIONER MARTINEZ**:  Is that all
17   involving that?

18        **INMATE EDWARDS**:  I think that's all --

19        **PRESIDING COMMISSIONER MARTINEZ**:  That assault
20   with a deadly weapon charge?

21        **INMATE EDWARDS**:  I think so, sir.  Actually,
22   yeah, what it was was a one of my younger sisters
23   boyfriend, I came and went by my mom's house and my
24   younger sister was arguing with my mom and I told her
25   to shut up, raised my voice at her, and her boyfriend
26   happened to be there and thought it was his job to
27   protect or to interfere, and he went in the kitchen and

30

1    he grabbed a knife.  I had a weapon, pulled a gun out,
2    and ran outside and shot in the ground one time and he
3    ran off.  Police came and arrested me.

4         **PRESIDING COMMISSIONER MARTINEZ:**  Again, looking
5    back at the September '81 there is a second charge with
6    a different case number, that is another assault with a
7    deadly weapon aside from the (inaudible) 16.

8         **INMATE EDWARDS:**  September '81, September '81,
9    oh Mary again.  We got in an argument and her uncle
10   jumped in the middle of it, and him and I got into a
11   fight.  And I didn't hit him with a deadly weapon or
12   anything, it might have been a battery or something,
13   but I thought I kicked him.

14        **ATTORNEY TARDIFF:**  He was convicted of a battery
15   on that, on the rap sheet it's got a 80W 191781 court
16   action with the battery was dismissed and count two he
17   was convicted of battery with 12 months probation.

18        **INMATE EDWARDS:**  Right.

19        **PRESIDING COMMISSIONER MARTINEZ:**  That's okay.
20   July of '83 under the influence of PCP?

21        **INMATE EDWARDS:**  Yeah, I smelled like PCP so
22   they thought I was under the influence and eventually
23   they just dropped it to a drunken in public I guess, or
24   something.

25        **PRESIDING COMMISSIONER MARTINEZ:**  With three
26   (inaudible) probation for it, county jail, then you
27   failed to appear in court, probation was revoked.

31

1    April of '82, sold PCP to an undercover officer in the

2    housing project.  Also another incident in May of '82,

3    6 of '82, liquid PCP to undercover officer, $600.  And

4    then in October of '82 a search warrant and in the

5    residence recovered two bottles of PCP, a sawed off

6    shotgun, two hand guns.  Received probation, then four

7    positive antinarcotics test results for PCP, and two

8    other occasions for tests, and you weren't going along

9    with the program at all.

10   **INMATE EDWARDS:**  No, sir.

11   **PRESIDING COMMISSIONER MARTINEZ:**  April of '94 a

12   warrant for the 187 murder --

13   **ATTORNEY TARDIFF:**  That's '84, not '94.

14   **PRESIDING COMMISSIONER MARTINEZ:**  That's '84?

15   **ATTORNEY TARDIFF:**  Yes.

16   **PRESIDING COMMISSIONER MARTINEZ:**  Oh I have '94.

17   April of '84.  Both charges were dismissed.  What was

18   that about?

19   **INMATE EDWARDS:**  Wrong guy.

20   **PRESIDING COMMISSIONER MARTINEZ:**  Wrong guy?

21   **INMATE EDWARDS:**  Wrong guy, yeah.

22   **PRESIDING COMMISSIONER MARTINEZ:**  September of

23   '84 they accused you of (inaudible)?

24   **INMATE EDWARDS:**  They accused me of apparently

25   in the area that I, that I mentioned earlier, somebody

26   had gotten, had gotten shot, and had gotten shot and I

27   never did get the details because by the time I got to

32

1    the preliminary hearing they had determined that it
2    wasn't me and they just let me go.  But, yeah, somebody
3    had gotten shot, and for some reason my description
4    popped up, and I was no where in the area, and I had
5    nothing to do with it.

6        **PRESIDING COMMISSIONER MARTINEZ:**  September of
7    '84 you had a warrant arrest for 246 shoot (inaudible)
8    vehicle, you were convicted, charged for trial, and
9    then you were sentenced to four years state prison,
10   sentence was suspended though, you didn't do that, you
11   were granted probation for five years.  You did 170 day
12   county jail on that.  Then June of '95 (inaudible) --

13       **ATTORNEY TARDIFF:**  '85.

14       **PRESIDING COMMISSIONER MARTINEZ:**  Boy they got
15   this, thank you, Counsel, '85, South Pasadena P.D.
16   warrant for false information to a P.O., no disposition
17   on that.  June of 1987 regarding P.D. arrest for
18   possession of narcotic substance, and that was
19   rejected, lack of probable cause in that case.  And
20   then (inaudible).  All right.  With that let's get into
21   personal history.  I'll just read that for the record.
22   Inmate was raised in a family where his mother and
23   father separated when he was five years of age.  Father
24   played a significant role even though he was raised
25   primarily by his mother.  (Inaudible) served time for
26   robbery, no other family members have a criminal
27   history.  Inmate's father was killed in 1979 during a

33

1    robbery and he became partial provider for the family.

2    Inmate was not ready for that responsibility.  Juvenile

3    delinquency sent to Maryland to live with an uncle.

4    Had a good employment history leading up to the date of

5    the offense.  Graduated in 1978 from Lake (inaudible)

6    High School in Baltimore Maryland, post-secondary

7    education.  Inmate did not serve in the military.  And

8    age did not play a primary role in the criminal

9    behavior.  The probation report indicates alcohol and

10   drug use influenced the commission of the crime.

11   (Inaudible.)  As far as the family who visits you here?

12       **INMATE EDWARDS:**  My wife and daughter, in fact

13   they were just up last week, I actually brought

14   pictures of them.

15       **PRESIDING COMMISSIONER MARTINEZ:**  Where do they

16   live?

17       **INMATE EDWARDS:**  My daughter she attends

18   Northridge, she lives in Northridge, Los Angeles

19   County, San Fernando Valley, Northridge.

20       **PRESIDING COMMISSIONER MARTINEZ:**  Where does

21   your wife live?

22       **INMATE EDWARDS:**  She lives in Monrovia, my wife

23   lives in Monrovia, and that's in Los Angeles County.

24       **PRESIDING COMMISSIONER MARTINEZ:**  What does she

25   do?

26       **INMATE EDWARDS:**  My wife, she's a bus driver,

27   and she drives a commuter bus for General Hospital.

34

1        **PRESIDING COMMISSIONER MARTINEZ:** And this is

2 the same wife that you were married to prior to your

3 commitment?

4        **INMATE EDWARDS:** This is the same wife, the same

5 one I've been with since I was 12 years old when I was

6 doing all the crazy stuff.

7        **PRESIDING COMMISSIONER MARTINEZ:** What other

8 support do you have?

9        **INMATE EDWARDS:** I have a well let's see --

10        **PRESIDING COMMISSIONER MARTINEZ:** Who do you

11 write to, who do you call, who visits you?

12        **INMATE EDWARDS:** Generally I talk to my mom, and

13 I have a younger sister, bless her heart she's a

14 probation officer, she just graduated a few weeks ago,

15 as a matter of fact. We communicate, we're really

16 tight, a lot. Me and my daughter is really really

17 close. Let's see, who else?

18        **PRESIDING COMMISSIONER MARTINEZ:** What about

19 your son?

20        **INMATE EDWARDS:** Well, Mario (phonetic), we

21 communicate but he's not, he's the kind of guy where

22 he's been on his own for so long, he writes from time

23 to time, he calls my wife, generally he, I generally

24 hear from --

25        **PRESIDING COMMISSIONER MARTINEZ:** He's a

26 stepson, right?

27        **INMATE EDWARDS:** He's my stepson. I generally

35

1    get a letter from him maybe once every three or four

2    months.  In fact, I just got a letter from him last

3    week.  He tried out for the Kansas City Chiefs,

4    graduated Texas Tech, he was a Red Raider and played

5    football.  Between my son, my daughter, and my wife,

6    that's my support group, that's who I rely and spend my

7    time with.

8         **PRESIDING COMMISSIONER MARTINEZ:**  Where does

9    your mother live?

10        **INMATE EDWARDS:**  My mother lives in Fresno.  My

11   mother's sisters, well, my mother, two of my sisters

12   live in Fresno, along with cousins.

13        **PRESIDING COMMISSIONER MARTINEZ:**  Where's your

14   grandmother at?

15        **INMATE EDWARDS:**  Auburn.  I talk to her, in fact

16   I try to talk to my mom at least once a month, and for

17   a while I hadn't called and she was real upset about

18   that so I started calling her real regular.  She

19   doesn't make a lot of money so I try not to

20   (inaudible).  But I do write and I make sure I send

21   cards and I receive mail from them.  I have one friend

22   that I'm really close with, in fact he just opened his

23   own electrical company, unfortunately it's up north.

24   I'm a certified electrician so he's been trying to get

25   me to come on up and branch out a little bit into home

26   theaters and that's lighting and home theaters, kind of

27   like my specialty.  But I don't intend to move up

36

1    north, at least not anytime soon. Other than that my
2    brother-in-law, which is my wife's brother, he's
3    (inaudible) Financial Group, he's offered me a job as
4    an account exec. And he also offered me a place to
5    stay if I need it. But me and my wife, we're good, of
6    course, support (inaudible).

7          **PRESIDING COMMISSIONER MARTINEZ:** All right.
8    Then the move for the move to Baltimore was very
9    positive for you, you were able to finish school and
10   get an education, but then came back into the Los
11   Angeles area was a big negative as it turned out.

12         **INMATE EDWARDS:** Yeah. You know, I'm not a
13   person who --

14         **PRESIDING COMMISSIONER MARTINEZ:** Okay, go
15   ahead.

16         **INMATE EDWARDS:** Yeah, I'm not a person to blame
17   anything that I do on circumstances or anybody else.  I
18   didn't really escape responsibility for anything I did.
19   I always worked, my father raised me to work, and I've
20   always earned my way. So when I came back and I got
21   excited with the glitter and the gold and the I need it
22   now, and my friends are driving Mercedes and they're
23   shopping out in Beverly Hills and they're doing all
24   these kinds of things, I got sucked in by that, I got
25   sucked in by it, and I put all of me into that and it
26   was a bad decision. And everything I've done that was
27   illegal had everything to do with my lifestyle and the

37

1    way I was living. So I know, I understand that today

2    better than I've ever understood it, in fact I

3    understood it when I was given this life sentence. So

4    I decided at that time, or maybe a few years later to

5    put myself in a position where if I liked nice things I

6    can afford them and I can do it legally. So today I

7    still like nice things, but I know that there's better

8    ways for me to do it. In fact I've applied myself in

9    areas where I know I can earn a living and have these

10   things, and I don't have to break the law to do it.

11       **PRESIDING COMMISSIONER MARTINEZ**: (Inaudible) to

12   talk about post-conviction factors.

13       **DEPUTY COMMISSIONER NUGA**: Good afternoon, Mr.

14   Edwards.

15       **INMATE EDWARDS**: Good afternoon.

16       **DEPUTY COMMISSIONER NUGA**: Okay. Let's see

17   here, I'm going to go over parole plans, institutional

18   programming, and your psych evaluation, okay?

19       **INMATE EDWARDS**: Okay.

20       **DEPUTY COMMISSIONER NUGA**: As I do that,

21   especially with the parole plans and the institutional

22   programming, if I leave something out or you know that

23   I leave something out please feel free to update me,

24   okay?

25       **INMATE EDWARDS**: Okay.

26       **DEPUTY COMMISSIONER NUGA**: Your counselor

27   actually did a real bang-up job on this, so I'm going

38

1    to rely on that rather than going through all this

2    stuff in here.  Okay?  But especially if I miss

3    something that I leave out.  First of all let's talk

4    about your parole plans.  You've provided us with a

5    sheet here which thank you very much. As far as

6    residence, you're at, I think we already noted earlier

7    that you plan to live with your wife in El

8    Padena(phonetic); is that still correct?

9        **INMATE EDWARDS:**  That's still correct.

10       **DEPUTY COMMISSIONER NUGA:**  And your wife is

11   Collette Felton, F-E-L-T-O-N?

12       **INMATE EDWARDS:**  Yes, sir.

13       **DEPUTY COMMISSIONER NUGA:**  Okay.  And there is a

14   letter in here stating that.

15       **INMATE EDWARDS:**  Yes, sir.

16       **DEPUTY COMMISSIONER NUGA:**  Just want to note

17   that.  Do you have a backup plan as far as the

18   residence is to stay with your daughter?

19       **INMATE EDWARDS:**  Yeah, actually we were talking

20   a few months ago, and she said why don't you put my

21   address down as a second so at least they'll know you

22   have two places to come.  I said I didn't think it was

23   really necessary.  She said, 'Well, do it anyway,' I

24   said, 'Well, you know you need to send a support

25   letter.'  And sometimes she's so busy, she goes to

26   school, she's a banker, she works long hours, so to

27   make a long story short she wrote the letter but

39

1    because the mail was backed up my last letter, the last

2    letter I received was postmarked on the 13th of last

3    month, so she sent it maybe a week and a half, two

4    weeks ago, and I hadn't received it yet.  But she did

5    offer me a place of residence.  There is a phone

6    number.

7        **DEPUTY COMMISSIONER NUGA:**  Right.  And her name

8    is Shenea (phonetic)?

9        **INMATE EDWARDS:**  Shenea Joy Edwards.

10       **DEPUTY COMMISSIONER NUGA:**  Joe?

11       **INMATE EDWARDS:**  Joy.

12       **DEPUTY COMMISSIONER NUGA:**  Joy?

13       **INMATE EDWARDS:**  Yes.

14       **DEPUTY COMMISSIONER NUGA:**  Same spelling of last

15   name.  And she lives in Los Angeles?

16       **INMATE EDWARDS:**  Yes.

17       **DEPUTY COMMISSIONER NUGA:**  In your wife's

18   residence, there's your daughter's out of the house,

19   she's going to Cal State Northridge, right?  Okay.  So

20   in that household, this is a single dwelling house?

21       **INMATE EDWARDS:**  Single dwelling house.

22       **DEPUTY COMMISSIONER NUGA:**  In El Padena, and

23   right there is your wife the only one who lives there

24   right now?

25       **INMATE EDWARDS:**  No, my wife, my mother-in-law

26   and myself.

27       **DEPUTY COMMISSIONER NUGA:**  Okay.  That's also

40

1    you have a backup plan, and I always ask that.

2          **INMATE EDWARDS:**  Okay.

3          **DEPUTY COMMISSIONER NUGA:**  And, okay, as far as

4    employment you already mentioned that I know earlier

5    the vocational stuff a little while, but you did say

6    you are, the documentation here that you are a

7    certified electrician?

8          **INMATE EDWARDS:**  Yes, I'm certified.

9          **DEPUTY COMMISSIONER NUGA:**  They say that, and

10   industrial, residential and --

11         **INMATE EDWARDS:**  And commercial.

12         **DEPUTY COMMISSIONER NUGA:**  Commercial, okay.

13         **INMATE EDWARDS:**  I'm also a member of the ETA,

14   Electronics Association.

15         **DEPUTY COMMISSIONER NUGA:**  Now, you have three

16   firm offers of employment, I did note that in the

17   central record.  There is an offer from Executive

18   Shuttle?

19         **INMATE EDWARDS:**  Yes, sir.

20         **DEPUTY COMMISSIONER NUGA:**  From a it's it

21   Gilbert Cox?

22         **INMATE EDWARDS:**  Yes.

23         **DEPUTY COMMISSIONER NUGA:**  That letter is dated

24   September 14th of '04.  And what kind of work would you

25   be doing there?

26         **INMATE EDWARDS:**  Driving a limousine, I'd have

27   to get my driver's license and go through the --

41

1      **DEPUTY COMMISSIONER NUGA:**  There's also a letter
2    dated 9/10/04 from Tony Thomas?

3      **INMATE EDWARDS:**  Yes, that's from (inaudible)
4    Chevrolet, and he offered me a job in customer service.

5      **DEPUTY COMMISSIONER NUGA:**  All right.  It's on
6    letterhead, he provides a copy of his business card.
7    And marketing and public relations, no he's the
8    marketing public relations manager, and he's offering a
9    job in that section?

10     **INMATE EDWARDS:**  Yes, sir.

11     **DEPUTY COMMISSIONER NUGA:**  Okay.  And the third
12   job offer is from Fred Ravaldo (phonetic), that's from
13   it's on letterhead, an insurance company?

14     **INMATE EDWARDS:**  Yeah.

15     **DEPUTY COMMISSIONER NUGA:**  Okay.  And what would
16   you be doing there?

17     **INMATE EDWARDS:**  He offered me a job as a
18   disclaimer, which he's going to have to teach me about,
19   I don't know very much about it, but he doesn't have a
20   problem with it.  He's a friend of the family.  There's
21   one that you didn't mention which is the one I actually
22   accepted.

23     **DEPUTY COMMISSIONER NUGA:**  Right, it's --

24     **INMATE EDWARDS:**  And that's this one.

25     **DEPUTY COMMISSIONER NUGA:**  Thanks.  That's from
26   Mr. Tracy Felton?

27     **INMATE EDWARDS:**  Yes, sir.

42

1      **DEPUTY COMMISSIONER NUGA:** From Felton Risk
2    Financial Group, it's on letterhead. And you'd be
3    doing what there?

4      **INMATE EDWARDS:** I would be an account exec and
5    he's going to have to show me a little bit about that,
6    I don't know much about it. What I do know is I can do
7    the math, you know, I've taken courses in accounting
8    and bookkeeping, and he's aware of that.

9      **DEPUTY COMMISSIONER NUGA:** Okay. And that's
10   located in Carson?

11     **INMATE EDWARDS:** Yes, in Carson City.

12     **DEPUTY COMMISSIONER NUGA:** City of Carson, okay.

13     **INMATE EDWARDS:** And because that letter was
14   dated, and I decided to use that one, I had him do a
15   new --

16     **DEPUTY COMMISSIONER NUGA:** Oh I see, he's also
17   got a new one that's '06.

18     **INMATE EDWARDS:** He's reaffirming my --

19     **DEPUTY COMMISSIONER NUGA:** Here, because that's
20   we're going back to that date.

21     **INMATE EDWARDS:** Okay.

22     **DEPUTY COMMISSIONER NUGA:** Of your prior
23   hearing. Okay. There was also before I forget there
24   were a couple of letters of support, one from your
25   wife. Now, do I understand it, you were married, then
26   you got divorced, then you were married again?

27     **INMATE EDWARDS:** Well, actually we were married

43

1    and we thought we were divorced, but we started the

2    paperwork but it somehow or another never got

3    completed.

4        **DEPUTY COMMISSIONER NUGA:**  So you were actually

5    married all --

6        **INMATE EDWARDS:**  We were actually married all

7    along.

8        **DEPUTY COMMISSIONER NUGA:**  I'll just read this a

9    little, that just verify that she's offering housing

10   here, "I love Mr. Edwards very much and I'm willing to

11   help in any way possible, and also provide housing and

12   transportation, etcetera, for items upon his release.

13   Mr. Edwards and I have a 19 year old daughter, and this

14   was dated in '05, 19 year old daughter together who

15   really loves her father and she's looking very forward

16   to his homecoming.  And also another letter of support

17   from your mother-in-law who also is in that household.

18       **INMATE EDWARDS:**  Yes.

19       **DEPUTY COMMISSIONER NUGA:**  She says she's known

20   you since you were 12 years old; is that correct?

21       **INMATE EDWARDS:**  That's correct, sir.  I knew my

22   wife since the seventh grade.

23       **DEPUTY COMMISSIONER NUGA:**  Anything else as far

24   as parole plans?

25       **INMATE EDWARDS:**  Oh I'm sorry.

26       **DEPUTY COMMISSIONER NUGA:**  Yeah, you did provide

27   the other stuff here.

44

1           **INMATE EDWARDS:**  Well, and I mentioned the
2    support groups and clinical.

3           **DEPUTY COMMISSIONER NUGA:**  Right.  You made
4    contact with the People ion Progress program?  Tell me
5    about that?

6           **INMATE EDWARDS:**  People in Progress, it's a
7    substance abuse program, actually it has four different
8    locations throughout southern California, and there is
9    one located in Los Angeles.  I believe I gave you a
10   copy?

11          **DEPUTY COMMISSIONER NUGA:**  Yes.

12          **INMATE EDWARDS:**  I gave you the actual letter?
13          **DEPUTY COMMISSIONER NUGA:**  Don Dahley
14   (phonetic)?

15          **INMATE EDWARDS:**  Yeah.  And it's a substance
16   abuse program, and I'm not sure exactly what it offers,
17   but what he did tell me is that it's a substance abuse
18   program that's a drop-in referral, come by.  My
19   intentions are when I do get out of here is to
20   participate in substance abuse program at least once a
21   week or once every two weeks.  I've almost become
22   accustomed to participating in them over the years, for
23   the last 15 years, 16 years, I've participated in them,
24   so I'd like to kind of keep that going.

25          **DEPUTY COMMISSIONER NUGA:**  And also a real nice
26   letter from you've been looking for a PIA for several
27   years now, it's Superintendent Walker, W-A-L-K-E-R, who

45

1    writes a letter on PIA letterhead confirming your
2    employability after having worked with you for a while,
3    and you having participated in their programs designed
4    to get inmates employable once they leave the
5    institution.   That looks like a pretty nice program.

6        **INMATE EDWARDS:**  Oh it's an excellent program.
7    Generally, I'm not sure if you're familiar with the
8    Eastern (phonetic) Facility, but the Eastern Facility
9    is actually a workers dorm, and most of the guys that
10   come out there if they have -- if they don't come out
11   with skills that they've already developed they develop
12   them while they're there.   What PIA is they've gone and
13   set up a program, IEP, Inmate Employability Program, to
14   help these guys find employment based on the skills
15   that they developed since they've been incarcerated.
16   (Interference.)

17       **DEPUTY COMMISSIONER NUGA:**  Just a minute.
18   That's it.

19       **INMATE EDWARDS:**  Any related information that
20   inmates want I'm generally the guy that goes out and
21   makes copies and provides that information to them.

22       **DEPUTY COMMISSIONER NUGA:**  Okay.   Your
23   institutional programming I think sounds like you have
24   some definite offers of employment and residence going
25   on there.   What we want to do is I'm just going to
26   refer to the counselor's report because they really did
27   a really good job, better so than most of them do.   I

46

1    don't want to leave anything out, okay. So since the
2    last hearing which was in '04, so what I'm going to do
3    is I'm going to start out, and again, if I leave
4    something out, it looks pretty complete, but if I leave
5    something out let me know.
6         **INMATE EDWARDS:** Okay.
7         **DEPUTY COMMISSIONER NUGA:** From the period of
8    6/29/04 to 6/28/05 vocational training they write,
9              "In review hearing, academics, received
10             a certificate in Electronics Technician
11             Association International, at 10/22/04
12             for successfully completing a technical
13             examination and requirements to be a
14             certified customer services specialist,
15             and a 128D dated 10/11/04, which notes
16             completion in CSI and CSS certificate
17             exams offered by the Electronics
18             Technician Association International at
19             CTF Central Facility. Work record.
20             Assigned to the PIA wood furniture
21             factory shop one, production offices and
22             production clerk. Received above
23             average to exceptional work grades per
24             his work supervisor's report, CDC, dated
25             12/1/04 and 6/1/04. His supervisor's
26             comments were, 'Edwards continued to do
27             an outstanding job in any assignment he

47

1          undertakes, especially in the Inmate

2          Employability Program, IEP, where he

3          excels.'   CDC 101 dated 6/1/05 through

4          1/05 noting exceptional work grades.

5          Group activities.   Completed Thomas

6          Gordon Family Effectiveness Training and

7          Harmony In The Home self-help program

8          per 128D dated 6/8/04.   He received a

9          128D dated 6/05 for completing the

10         requirements for a self-help chrono

11         exercised by reading self-help books and

12         writing reports on what he has learned.

13         Psych Treatment.   None during this

14         review period.   Prison Behavior.   None

15         during this review period."

16         Skipping ahead to the next review period,

17    6/29/05 to 4/12/06.

18         **PRESIDING COMMISSIONER MARTINEZ:**  Isn't there

19    two separate addendums?

20         **DEPUTY COMMISSIONER NUGA:**   Yeah, I have still

21    got them.

22         "Vocational training.   None during this

23         period.   Academic.   None noted during

24         this period.   Work record.   Edwards

25         continued in the PIA maintenance

26         section as a production coordinator and

27         received exceptional and above average

48

1        ratings in various categories in his

2        work supervisor's reports.  Group

3        activities.  Inmate Edwards continuous

4        participation in AA and NA program.

5        During this period received several CDC

6        128D laudatory chronos.  On 7/29/05 he

7        received a laudatory chrono for

8        participating in an anger management

9        program.  Psych treatment.  None noted

10       during this time.  Prison behavior.

11       Remained disciplinary-free during this

12       period.  Other.  On 8/17/05 Edwards

13       received a CDC 128D chrono for

14       successfully completing a three-week

15       anger management Cage Your Rage

16       workshop.  On 11/14/05 he additionally

17       received a laudatory chrono for

18       completing an impact program.  On

19       12/27/05 inmate Edwards received a

20       laudatory chrono for his participation

21       in the annual children's holiday

22       festival.  On 1/23/06 Edwards received

23       a laudatory chrono for a chairmanship

24       for the education committee for the

25       Fathers Behind Bars Group.  On 6/6/05

26       he concluded the requirements for a

27       self-help chrono for his book report

49

| | |
|---|---|
| 1 | 'Caring Enough To Confront.'  He |
| 2 | recently received a certificate of |
| 3 | membership in Electronics Technology |
| 4 | Association.  Lastly, per this inmate's |
| 5 | request is afforded a BPH (inaudible) |
| 6 | evidence for CDC 128D dated 4/2/06." |
| 7 | I'm skipping ahead to the next period. |
| 8 | "Review period for 4/2/06 to 9/21/06. |
| 9 | Vocational training.  None noted during |
| 10 | this period.  Academics.  None noted |
| 11 | during this period.  Work record. |
| 12 | Edwards continued his assignment in the |
| 13 | PIA maintenance section as a production |
| 14 | coordinator and has received |
| 15 | exceptional and above average ratings |
| 16 | on his CDC 101 work supervisor's |
| 17 | report, dated 9/1/06.  Group activity. |
| 18 | On 5/15/06 inmate Edwards received a |
| 19 | certificate of appreciation and a CDC |
| 20 | 128D laudatory chrono for his |
| 21 | exceptional service and unselfish |
| 22 | dedication to giving back to the |
| 23 | community, from initial J., last name, |
| 24 | Salvage, CC3, Fathers Behind Bars |
| 25 | Group.  In addition, Edwards continued |
| 26 | his AA/NA programs since 3/97, for CDC |
| 27 | 128D laudatory chrono dated 6/30/06. |

50

| | |
|---|---|
| 1 | Psych treatment.   None.   Prison |
| 2 | behavior.   Edwards remained |
| 3 | disciplinary-free during this period. |
| 4 | Other.   On 3/1/06 inmate Edwards |
| 5 | received a CDC 128D informational |
| 6 | chrono from Officer Sterling stating |
| 7 | that Edwards work habits are |
| 8 | professional and above average to |
| 9 | exceptional.   On 3/15/06 Correctional |
| 10 | Officer Rocina (phonetic) wrote a CDC |
| 11 | 128D informational chrono stating that |
| 12 | after observing Edwards for over eight |
| 13 | years this inmate has proven himself to |
| 14 | be respectful and personable with both |
| 15 | staff and inmates.   He described |
| 16 | Edwards as having extensive knowledge |
| 17 | and was assigned duties with a |
| 18 | professional work ethic.   On 3/20/06 |
| 19 | Correctional Officer Garza (phonetic) |
| 20 | also wrote an informational chrono |
| 21 | stating the positive interactions with |
| 22 | Edwards with staff and inmates.   He |
| 23 | completed the chrono by stating that |
| 24 | Edwards' character should be noted. |
| 25 | Lastly, this writer observed Edwards' |
| 26 | parole plans documented in the |
| 27 | miscellaneous section in the central |

51

| | |
|---|---|
| 1 | file delineating his goals, residency, |
| 2 | and employment preparations, support |
| 3 | group and clinical support.  This |
| 4 | correctional counselor, write of this |
| 5 | report, also wishes to state that |
| 6 | through his ongoing interactions with |
| 7 | inmate Edwards I have observed Edwards |
| 8 | as an individual who communicates |
| 9 | extremely well, is very organized and |
| 10 | professional in his manner, respectful |
| 11 | and helpful to others, and a person who |
| 12 | is well-focused on the positive with |
| 13 | self-confidence and stability." |
| 14 | Okay.  Did I miss any periods since the |
| 15 | last hearing? |
| 16 | **PRESIDING COMMISSIONER MARTINEZ:**  No, sir. |
| 17 | **DEPUTY COMMISSIONER NUGA:**  Okay.  Anything else |
| 18 | that you wish to add as far as programming, as far as |
| 19 | educational, vocational, laudatory chronos, self-help, |
| 20 | during that period? |
| 21 | **INMATE EDWARDS:**  No. |
| 22 | **DEPUTY COMMISSIONER NUGA:**  Since your last |
| 23 | hearing? |
| 24 | **INMATE EDWARDS:**  Since my last hearing, I |
| 25 | believe anything, no I think you covered it. |
| 26 | **ATTORNEY TARDIFF:**  Did you get the OSHA updates? |
| 27 | **INMATE EDWARDS:**  Forklift.  Lift truck |

52

1    certification?

2        **ATTORNEY TARDIFF**: Yes. Dated 3/17/06, and

3    expires on 3/17/09. And you got the certified, the

4    customer service, I believe.

5        **INMATE EDWARDS**: Yes.

6        **DEPUTY COMMISSIONER NUGA**: Thank you. Okay.

7        **ATTORNEY TARDIFF**: And then the PIA letters.

8        **DEPUTY COMMISSIONER NUGA**: The PIA letters I

9    already mentioned, the ones from Superintendent Walker?

10        **INMATE EDWARDS**: There should be a previous one,

11    which is this one here from August 29, '05?

12        **DEPUTY COMMISSIONER NUGA**: Right, as far as the

13    certified operator for OSHA, yeah, you have your

14    operator's certification in a furniture factory.

15        **INMATE EDWARDS**: This one.

16        **DEPUTY COMMISSIONER NUGA**: Then we have another

17    letter by Superintendent Walker from PIA dated August

18    29th of '05. It says this letter serves as an update to

19    the aforementioned letter which in the central file in

20    order to conserve time. And here's, "Having supervised

21    Mr. Edwards directly for the last seven years has

22    allowed us to observe his character, he continues to be

23    dependable, tactful, conscientious, trustworthy,

24    hardworking, and respectful, and is an asset to PIA."

25    There were lots of documentation in the central file,

26    individuals chronos from PIA documenting your high

27    quality work.

53

1          **INMATE EDWARDS:**   Okay.

2          **DEPUTY COMMISSIONER NUGA:**   The next thing I want

3    to do is address your disciplinaries since you've been

4    incarcerated.

5          **INMATE EDWARDS:**   Yes, sir.

6          **DEPUTY COMMISSIONER NUGA:**   I counted a total of

7    four negative 128s, the last one was January 20th of

8    1996 for failure to leave the dining hall.  And then I

9    counted a total of five CDC 115s, the last of which was

10   July 5th of 1996, for it was a serious 115 and it was

11   reduced to an administrative 115 for misuse of state

12   property.  So that was a little over 10 years ago is

13   your last 115.  Does that pretty much summarize your?

14         **INMATE EDWARDS:**   Yes.

15         **DEPUTY COMMISSIONER NUGA:**   Okay.

16         **INMATE EDWARDS:**   I mean if you want me to

17   comment on that leaving the dining hall?

18         **DEPUTY COMMISSIONER NUGA:**   That was a 128.

19         **INMATE EDWARDS:**   Okay.

20         **DEPUTY COMMISSIONER NUGA:**   Okay.  The next thing

21   I'm going to do is before I get to your psych

22   evaluation is there was a response from the 3042 notice

23   by the Los Angeles Police Department.  It's real short,

24   I'm going to read it into the record.  It's written by

25   Greg R. Hall, H-A-L-L, Captain Commanding Officer

26   Detective Support Division, dated May 30th, 2006.  The

27   text of the letter reads as follows:

54

| | |
|---|---|
| 1 | "Edwards was involved in a dispute with |
| 2 | the victim concerning narcotics. Edwards |
| 3 | became angry and shot the victim to |
| 4 | death. At the time of the murder Edwards |
| 5 | had an extensive arrest history and was |
| 6 | on felony probation. Edwards is a |
| 7 | dangerous individual that cannot be |
| 8 | counted on to avoid future criminality. |
| 9 | We recommend his parole be denied. It is |
| 10 | the Department's position to adamantly |
| 11 | oppose the release of this inmate back |
| 12 | into the community. Edwards should |
| 13 | remain segregated from society." |

14          That was from, again, Greg Hall, Captain

15   Commanding Officer Detective Support Division, LA P.D.

16   The next thing I'm going to do is go to your psych

17   evaluation, by Dr. Macomber, first initial M, last name

18   spelled M-A-C-O-M-B-E-R, PhD., psychologist, dated or

19   he saw you on May 18th of 2006.

20          **INMATE EDWARDS:** Sounds right.

21          **DEPUTY COMMISSIONER NUGA:** What I'm going to do

22   with that is hit some high points in the doctor's

23   report. The current diagnostic impression the doctor

24   gives you an Axis I diagnoses, writes, "no mental

25   disorder." Axis II, writes, "no personality disorder."

26   Axis III, "no physical disorder." Axis IV, "life term

27   incarceration." Axis V, "current GAF of 95," that's on

55

1   a scale of zero to a hundred, a hundred being very best
2   possible.  Okay.  And in a recent excerpt from the
3   doctor's report under "Assessment of Dangerousness,"
4   the doctor writes,

5              "In considering potential for dangerous
6              behavior in the institution Mr. Edwards
7              has remained disciplinary-free for ten
8              years.  I agree with the prior
9              evaluators that stated that at this
10             point in his life he poses no risk to
11             the institution or to society.
12             Compared to other inmates the potential
13             for dangerous behavior is below
14             average.  In considering the potential
15             for dangerous behavior in the community
16             I also agree with the previous
17             evaluators that he does not pose any
18             more risk to society than the average
19             citizen in the community.  This is
20             supported by the level of service
21             inventory revised, which is an
22             actuarial measure that assesses
23             criminal history, drug abuse, current
24             attitudes and other factors to
25             determine current risk level on parole.
26             This score places him in the low risk
27             category.  At this point in his life he

56

1     does not pose a risk to society.   In
2     fact, based upon his life experiences
3     and his growth and maturity he probably
4     poses a lower risk to society than the
5     average citizen.   There are no
6     significant risk factors in this case."
7          And, lastly, in the doctor's final paragraph
8     under "Clinician's Observations, Comments and
9     Recommendations," the doctor writes,
10          "There are no mental or emotional
11          problems in this case that would
12          interfere with routine release plans.
13          This man has outstanding vocational
14          skills, he is fully qualified and
15          certified in all phases of being an
16          electrician.   He has several current
17          valid job offers in high-paying
18          positions.   He also has a supportive and
19          faithful wife that has stuck by him all
20          these years.   He has strong grounded
21          ties with family, support from the
22          community, all of these factors are
23          strong indicators that he will do well
24          in the community.   The prognosis for
25          successful adjustment in the community
26          in this case is excellent."
27          The all the other psych reports that doctor

57

1    points out that they were all positive, and he agreed
2    with their assessments.

3         **ATTORNEY TARDIFF:** I think that covered
4    everything.

5         **DEPUTY COMMISSIONER NUGA:** Mr. Martinez?
6         **PRESIDING COMMISSIONER MARTINEZ:** Now, we go to
7    questions. I don't have any at this time.

8         **DEPUTY COMMISSIONER NUGA:** I don't have any
9    further questions right now.

10        **DEPUTY DISTRICT ATTORNEY BUSHLING:** Just a
11   couple of quick things. My notes reflect that in the
12   2004 hearing the inmate stated the victim was not
13   armed. It sounded like today he said that the victim
14   was armed at the time of the murder. I'm just
15   wondering if you could shed any light on that?

16        **INMATE EDWARDS:** I believe the witness who
17   stated, and it's we're speaking of three different
18   people who were looking at the same thing and see
19   something different. Prior to going to Charlene
20   Baines's house, he pulled a weapon on me. Now, when I
21   got to Charlene Baines's house it was in my mind that
22   he had a weapon. Did I see him pull a gun out? No,
23   sir, I didn't see him pull a gun out at that time. But
24   it was in my mind that he had a weapon.

25        **DEPUTY DISTRICT ATTORNEY BUSHLING:** And moving
26   to a totally different area I understand that the
27   inmate believes he will be employed in Carson, that he

58

1    would be living in the Valley. I'm just trying to
2    figure out how he would get from one place to the other
3    because they're quite far apart?

4        **INMATE EDWARDS:** Yes, I won't be living in the
5    Valley, sir, I'll be living in Altadena, and my wife
6    she commutes from Altadena to the greater Los Angeles
7    area, and we can share that vehicle until I can get my
8    own. Carson is approximately 15 miles, maybe. I think
9    the parole office allows me a 50 mile radius. If I
10   need to find another job I don't have a problem with
11   that.

12       **ATTORNEY TARDIFF:** No questions.

13       **PRESIDING COMMISSIONER MARTINEZ:** All right. I
14   don't have anything further, unless you do?

15       **DEPUTY COMMISSIONER NUGA:** No.

16       **PRESIDING COMMISSIONER MARTINEZ:** We'll turn it
17   over to Mr. Bushling for closing statements.

18       **DEPUTY DISTRICT ATTORNEY BUSHLING:** Mr. Edwards
19   I think presents very well, and he should be commended
20   for his achievements and his organizational skills.
21   He's come in here with I haven't seen a binder like
22   that since I was in law school probably. He's done a
23   great job and in many areas. My question though is how
24   much of what risk is it fair to expose society to,
25   expose the public to. Mr. Edwards has proven himself
26   capable of great violence, and has a long history of
27   violence. His record goes back to 1973, and it really

59

1   didn't end until 1996 when he receive his last 115, I
2   believe. So we have an individual here who has proven
3   that in the last ten years in an institutional setting
4   where there are a lot of strictures and structures to
5   modify his behavior he can behave well. But even for
6   the first several years he was here he was unable to
7   conform his conduct. So my question really is how much
8   risk is it fair to expose society to? We know that Mr.
9   Edwards is capable of great violence. Is it fair to
10   expose the public to his capabilities? And that's the
11   question this Board's going to have to answer. Based
12   on his record and his history the People are opposed to
13   his release.

14   **PRESIDING COMMISSIONER MARTINEZ:** Thank you.
15   Counsel?

16   **ATTORNEY TARDIFF:** Thank you. Well, I think
17   that the issue is it boils down to if Mr. Edwards poses
18   an unrealistic danger if released out in society. I'm
19   not going to -- we've gone through his programming, I'm
20   not going to reiterate it. It's obvious he's done much
21   more than is required of the man for this point. In
22   terms of -- so basically then the issue is is he going
23   to be denied parole based on his pre-conviction
24   history. That's the bottom line. And if you want to
25   say that based on that alone he poses an unreasonable
26   risk of danger today that's what you have to conclude.
27   Obviously at the time of the commitment offense and

60

1    before the commitment offense he did pose a risk of
2    danger to society, obviously. So do we carry that same
3    thing forward now to today and say based on what he was
4    then, that's basically is he the same individual he was
5    then, or has he changed sufficiently. Part of the
6    reason he's asked to do programs, any inmate is asked
7    to do programs, to do self-help, to upgrade themselves,
8    to get training, to have parole plans, is to assure the
9    Panels that the individual is not a risk because they
10   have done these things that they were asked to do to
11   make them less dangerous or to pose no danger. He's
12   done all that, so what he has done does it outweigh, I
13   guess, would be also we're looking at his history, his
14   criminal history and his crime. And has his
15   programming that he's performed does it outweigh the
16   risk he was prior. And I think that it does, and the
17   reason I say that is there is some positive factors in
18   his background, okay, that he can still has within
19   himself that we all carry our entire lives, our
20   upbringing, so to speak. He was a high school graduate
21   and went to college. I think what happened with him
22   specifically is he found he could make fast money, lots
23   of money fast selling dope. And like he said he liked
24   nice things and found out that there was a way of
25   getting it without having to really work very hard. As
26   a result I guess he lost a lot of his ethics and would
27   do just about anything. But in either event he had, it

1    appears he came from a stable family, granted his
2    parents did not stay together but his father was very
3    active in his life as well as his mother, so both
4    parents were there. And they tried to set boundaries,
5    so it's not like he doesn't know right from wrong
6    because he does. It's not like one of these, some of
7    the inmates we get that were not taught anything in
8    terms of right and wrong. The probation officer's
9    report states that under employment stability states
10   the last five years he had stable employment. We know
11   he knows how to work. In terms of the District
12   Attorney's remarks, he has been capable of great
13   violence, somebody was killed because of what he did.
14   That's a given. I would like to point out though in
15   terms of the commitment offense, in the sentencing
16   transcript, and this is from his attorney, but what he
17   presented to the judge at that time, and it was
18   basically -- and it was rejected ultimately at that by
19   the court, improper or imperfect self-defense. "The
20   court will note in the arguments as to whether there
21   was premeditation, and if there was discussions earlier
22   in the day that Mr. Bradley did have a gun earlier in
23   the day." And this is on page 3 of the sentencing
24   transcripts, starting on line 17.

25              "The testimony of Detective Lovato, L-O—
26              V-A-T-O, as to what the witnesses told
27              him initially, if memory serves me, Ms.

62

1          Baines said he did have a gun when he

2          went over the first time, although he was

3          not pointing or threatening anybody with

4          it.  Given all of these factors it is

5          reasonable in the mind of Mr. Edwards

6          that at that time having the discussions

7          earlier, having used cocaine, also

8          negating the specific intent required by

9          murder, the fact he had a gun earlier,"

10         and I'm assuming that they're referring

11         to the victim -- that's my words, "the

12         fact that there had been a statement by

13         Mr. Bradley that he was looking for

14         someone, given all these factors I would

15         suggest to the court,"

16         and it goes into the malice.  But the reason I

17    point that out is that's what his testimony has always

18    been, that he was fearful.  And it goes on again, page

19    7 of that same hearing, it actually starts on page 6,

20    line 27,

21         "A review of the evidence it could be

22         argued from Mr. Edwards' perspective

23         that he was in danger and only acted

24         when he was almost literally and

25         figuratively against the wall in his

26         actions.  Certainly Mr. Bradley did not

27         deserve to die in terms of an equitable

63

1       view, Mr. Bradley did appear to be

2       looking for trouble throughout the day

3       and into the evening."

4       So I'd like to just submit that in terms of the

5  commitment offense.  Now, the 115 that in '96 the

6  District Attorney stated continues to show great

7  violence, again that was an administrative 115.  And

8  that's the only one he was fighting, but apparently was

9  reduced to administrative 115.  Well, actually the '96,

10 but he had an '88 fighting, I guess if you want to say

11 he was violent throughout his incarceration, which he's

12 not, he had an '88 fighting, but that was reduced to an

13 administrative 115.  So that's not serious either.  So

14 he doesn't really, he had no -- and in terms of the use

15 of 115s as a unsuitability factors, if they involve

16 force or violence those are the ones that carry the

17 weight.  He doesn't have any of those.  In terms of the

18 psych evals, they've been gone over, favorable.  I

19 would just like to quote, though, in the '03 psych

20 evals the prior Panel had asked for specific

21 information from the '03 psych eval, the previous

22 Panel.  And basically it was the importance of drug and

23 alcohol, explore the commitment offense, his level of

24 dangerousness in the community.  At that time the '03

25 psych eval stated,

26      "There is no indication the interviewee

27      devalues or thinking would be

64

```
 1          characterized as antisocial.  It is
 2          evident that inmate Edwards has changed
 3          significantly.  If anything it could be
 4          stated that he has traits of antisocial,
 5          that it could stated that he had traits
 6          of antisocial personality disorder in
 7          the past which have now been resolved.
 8          I also cannot find evidence of extensive
 9          drug abuse or dependency that would
10          warrant a diagnostic label in this case.
11          Again, no Axis I, II, III, high GAP
12          score of 90."
```

13          And then it went into the review of the life

14    crime, Edwards had been very frightened, he'd been

15    actively pursued throughout the day by the victim.

16    Statements of remorse appeared to be quite sincere and

17    genuine.  He has also under assessment of

18    dangerousness,

```
19          "He has refrained from any aggressive
20          behavior in the institution since from
21          14 years prior.  He does show evidence
22          of considerable growth and maturation
23          or maturity in his life.  And it is,
24          it's true, inmate Edwards violent
25          potential in the community was high at
26          the time of the commitment offense.  At
27          this point in his life after years of
```

65

| | |
|---|---|
| 1 | incarceration, coming to genuine |
| 2 | feelings of remorse and sorrow.   His |
| 3 | violence potential is severely reduced. |
| 4 | I do not believe that he is more |
| 5 | dangerous than the average citizen in |
| 6 | the community.   He certainly is |
| 7 | definitely below average in comparison |
| 8 | to other inmates." |

9         And the only risk factor in the '03 was he would

10   return to the criminal lifestyle.   And it says,

11         "This is a thing of the past, and he has made

12   significant changes in his life.   The probability of

13   his reverting back to this destructive lifestyle in

14   view of his realization of what it has resulted in, is

15   nil."

16         And, in addition, he does have excellent

17   vocational skills which will generated a great deal of

18   money in the community or to him and he can legally

19   support his lifestyle he wants.   I don't know if he'll

20   be able to afford a Corvette, but.   And then it goes

21   into several factors which indicate his subsequent

22   parole adjustment, and that goes to the end of the

23   excellent vocational skills, he's highly employable,

24   strong and supportive relationship with his wife,

25   mother and siblings.   And then it concludes with the

26   other issue asked by the Board, that drugs or alcohol

27   is not a risk factors, he was never seriously addicted

66

1    to these substances, he has adequately explored factors
2    underlying the commitment offense, he has come to terms
3    with this offense in his life and there's no need for
4    any further psychotherapy program. His prognosis for
5    adjustment in the community is excellent. And then,
6    just lastly, the 2000 states that his chance of
7    committing a serious crime would probably average to
8    below average. And I'm assuming that that's as it
9    relates to other citizens in the community. Also, when
10   the counselors were allowed to make assessments of
11   dangerousness, which stopped around I believe in August
12   of '04, somewhere around that time they were told they
13   couldn't do that anymore making assessments of
14   dangerousness, in Mr. Edwards case he received a low
15   degree of threat from his counselors who knew him
16   pretty well, in '04, in '03, in '02, and in 2000. So
17   not only do we have the psych evals we have the
18   counselors backing up his low degree of threat. The
19   letter from the LA P.D. their objections to finding of
20   suitability is based strictly on the commitment offense
21   alone, he doesn't know anything about what Mr. Edwards
22   has done since he's been incarcerated, whether or not
23   he is a changed individual. They would write that same
24   letter if he were an inmate had not remained
25   disciplinary-free for any period of time and had
26   numerous force and violent 115s, it would have been the
27   same exact letter, because they don't know what the

67

1    inmates do. So I just don't think that their arguments
2    are very valid. I certainly think that Mr. Edwards has
3    done everything humanly possible since he's been
4    incarcerated to make himself suitable. There's nothing
5    more he can gain from further incarceration other than
6    to continue to punish him for the commitment offense.
7    If we're going to set these programs up and tell the
8    inmates do this or that because that's going to make
9    you less of a danger, he's done that, that's what he's
10   done, he's reduced his risk of violence from the time
11   of the commitment offense. And I do believe that he
12   does not pose any risk in re-offending at this time.
13   Thank you.

14   **PRESIDING COMMISSIONER MARTINEZ:** Thank you,
15   Counsel. Mr. Edwards, now your opportunity to tell us
16   why you feel you're suitable for parole.

17   **INMATE EDWARDS:** I'll start with on June 8th,
18   2006, I appeared before BPH Commissioner Shelton for my
19   sixth subsequent parole consideration hearing. At that
20   time Commissioner Shelton pointed out to me that I had
21   done well in taking advantage of the opportunities
22   afforded me while incarcerated. He indicated to me
23   that I had achieved what was necessary to once again be
24   found suitable for parole. As a result I was found
25   suitable that day. In going to the hearing I expressed
26   my concerns regarding the office of the District and
27   their opposition to my parole. My concerns were that

68

1   my 2003 suitability findings were not opposed, however,
2   hearings thereafter was.  Although the opposition was
3   minimal, during the June 8th hearing my parole was once
4   again opposed, as it is today, as to this Panel there
5   seems to be an inconsistency here.  However, as I
6   mentioned during my previous hearings I'm not here
7   today to impress upon the District Attorney, but to
8   convey, to impress this upon the District Attorney what
9   conveyed to this Panel why I believe, as the psych
10  does, as the institutional counselor does, as present
11  staff who know me well does, as the victim's family, my
12  family and friends, and ultimately Commissioner Shelton
13  and Deputy Commissioner who found me suitable for
14  parole during the June 8th hearing, that I am ready and
15  should be found suitable for parole today.  Since this
16  Panel, excuse me, for this Panel's benefit as well as
17  the Governor's, I'd like to make clear that since the
18  day this crime took place I have accepted sole
19  responsibility for the death of Mr. Bradley, as I have
20  stated time and time again I've never tried to minimize
21  my culpability or justify the crime.  I simply did the
22  best I could to explain my state of mind at the time
23  the crime was committed.  Sadly Mr. Bradley died as a
24  result of this, for this I can never apologize enough.
25  I realized a long time ago that I could never change
26  the crime that took place that night, but I could
27  change the person who was ultimately responsible for

69

1     it. This continues to be my past. Throughout my
2     incarceration I have taken several therapy programs,
3     and to some extent I have benefited from the all.
4     However, until I was able to exchange dialogue with the
5     victim's family and relive the events that led to the
6     fatal shooting of Mr. Bradley was I able to completely
7     understand the impact of the crime on the victim's
8     family, and on myself and my family. Being able to
9     share the truth with someone, and I'm speaking about
10    Crystal, the victim's daughter, I want you to know was
11    the most therapeutic experience I have ever had. It
12    was at that point that I understood my offense and the
13    precautions I had to take to prevent this from ever
14    happening again. I attended AA and NA for the past 16
15    years in an effort to incorporate those steps necessary
16    to a productive lifestyle. I have taken the American
17    Program which focused on developing self-motivation
18    skills for constructive thinking. Family Effectiveness
19    training which focused on keeping harmony in the
20    household. The impact program, which allowed me to
21    view the crime from the victim's perspective. I've
22    read numerous self-help books and written reports on
23    what I've learned. Additionally, I've had the occasion
24    to take Cage Your Rage program, one on one therapy,
25    rational behavior, and even anger management. I became
26    a certified in infectious disease peer educator for the
27    Center for Disease Control so that I could fully

70

1    understand the effects of drug use as avoidance to

2    infectious diseases.  Sharing information with people I

3    hope that could change their lives as it did mine.  I'm

4    also a certified literacy tutor with (inaudible)

5    International.  I've had numerous inmates learn the

6    English language and obtain a general education at

7    home.  Today I facilitate, excuse me --

8         **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  Just

9    stop right there, I'm going to change the tape.

10             **(Tape Two, Side Two)**

11        **PRESIDING COMMISSIONER MARTINEZ:**  Okay.  Go

12   ahead.

13        **INMATE EDWARDS:**  Okay, thank you.  Today I

14   facilitate the new employability, the employability

15   class sponsored by the Prison Industry Authority.  I'll

16   bring eligible life term prisoners and parolees to

17   prepare employment packages upon their release.  I have

18   incorporated these tools in my own life in an effort to

19   change my lifestyle.  I believe I accomplished that.

20   Since the June 8th hearing I have continued to

21   participate in the program that I -- that will

22   influence my lifestyle upon release.  They include

23   NA/AA, which was stipulated as a condition of my parole

24   by BPH Commissioner Linda Shelton, refer to recent

25   chronos, please.  Violent Home Series, which focused on

26   the drug culture and the negative effects of it.

27   Finally, the Fathers Behind Bars Group, which continued

1    to provide me the opportunity to help us manage
2    children.   In my November 2004 hearing the Panel made
3    specific recommendations.   Number one, not to receive
4    any 115s or CDC 128s.   I have received none.   They
5    asked me to stay disciplinary-free.   I have remained
6    disciplinary-free.   They requested that I earn positive
7    chronos.   To date I have received approximately 19
8    positive chronos, four of which for informational
9    purposes only in three, which have been received since
10   the June 8th hearing along with five certificates of
11   various achievements with one being received since the
12   June 8th hearing.   They include the ETA membership
13   certification, lift truck operator certification,
14   certificate of completion for the Impact Program, and
15   certificate of appreciation from (inaudible)
16   contributions 2005 Annual Children's Holiday Festival.
17   Number four, they asked me to participate in self-help
18   programs.   Since the 2004 hearing I participated
19   consistently in AA/NA.   I have completed Dr. Rosbus
20   (phonetic) Anger Management Cage Your Rage workshop,
21   the Impact Program, and read self-help books and wrote
22   reports on what I've learned.   During the month of
23   October 2006 I participated and completed a six-part
24   series of issues related to going home, the drug
25   culture, and it's negative effects on family, health
26   and the community.   I'd like to add that for the past
27   eight years I've been housed here at CTF Eastrun

72

1    Facility.  Each year approximately 90 days prior to my
2    parole hearings a correctional counselor sits with me
3    for a few hours to review my programming since the last
4    hearing, and an evaluation report is prepared.
5    However, this report is based on a two-hour interview.
6    When we consider the counselor's heavy caseload and the
7    limited information it's amazing that they do the job
8    as well as they do.  However, it seems to me that if
9    the Panel and the Governor want to hear from
10   correctional staff who regularly communicate with me
11   throughout my daily activities, at work, in housing,
12   and in the yard it would provide a more thorough and
13   complete evaluation of who I am today.  For this
14   purpose four chronos were submitted, and I believe your
15   record shows them.  In closing I'd like to state one
16   more thing, the Governor had two major concerns when he
17   reversed my parole.  The first was that I didn't have
18   employment, and he was worried that I would revert back
19   to what I was doing before.  The second was that my
20   parole plans weren't solid.  Today I have three job
21   offers and my parole plans are solid.  I can't do
22   anything else.  Thank you.
23        **PRESIDING COMMISSIONER MARTINEZ**:  With that
24   we'll recess for deliberation.
25                      **R E C E S S**
26                        --o0o--
27

73

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                       **D E C I S I O N**

3           **DEPUTY COMMISSIONER NUGA:**   Okay.   We're back on

4       the record.

5           **PRESIDING COMMISSIONER MARTINEZ:**   All right.

6       All people previously identified have now returned.

7       Again, this is in the matter of Cornelius Edwards, CDC

8       number D, as in David, 74803.   The Panel reviewed all

9       information received from the public and relied on the

10      following circumstances in concluding that the prisoner

11      is suitable for parole and will not pose an

12      unreasonable risk of danger to society or threat to

13      public safety if released from prison.   The prisoner

14      has a stable social history, as exhibited by reasonably

15      civil relationships with others.   While in prison he

16      has enhanced his ability to function within the law

17      upon release through participation in educational

18      programs, self-help, and/or therapy programs,

19      vocational programs, and institutional job assignments,

20      and we'll break down a few of those.   In regards to

21      educational programs the prisoner has involved himself

22      with several courses, and completed again has

23      participated in college courses, received -- although

24      he had a high school diploma received his GED in 2004,

25      and has been involved in business mathematics course,

26      and certificate for law for business.   In regards to

27      **CORNELIUS EDWARDS D-74803 DECISION PAGE 1   11/08/06**

1    vocational programs he is a certified electronic
2    technician in the areas, as far as expertise,
3    industrial, residential and commercial wiring.
4    Certified forklift operator, certificate of completion
5    of the principles in real estate. Concerning his
6    regards to self-help and therapy programs that are
7    involved in continuous basis with AA/NA.  He
8    participated in the Lombach (phonetic) Tutoring Program
9    as a tutor, Dr. Gordon's Family Effectiveness Training,
10   Cage Your Rage Program in 2005, Fathers Behind Bars
11   Group, the Impact Program. In regards to institutional
12   job assignments I also want to indicate too that he was
13   involved in emergency management institution with FEMA,
14   a certificate in that as well. But in regards to his
15   institutional job assignments there's a PIA
16   Correctional Coordinator, numerous laudatory chronos
17   from the PIA superintendents, and several years of PIA
18   work chronos, and all very positive for Mr. Edwards.
19   Because of maturation, growth, a greater understanding
20   as advanced age, he has a reduced probability of
21   recidivism. Has realistic parole plans which include
22   three job offers documented with letters.  And family
23   support, as well, has maintained close family ties
24   while in prison via letters and visits, and again has
25   indicated that today his marriage is still intact.
26   Shows signs of remorse, as indicated he understands the
27   **CORNELIUS EDWARDS D-74803 DECISION PAGE 2  11/08/06**

75

1    nature and the magnitude of the offense and accepts

2    responsibility for his criminal behavior (inaudible)

3    citizenship.  In regards to psychological factors, the

4    psychological report dated May 18th of 2006 offered by

5    Dr. Macomber is favorable.  For the record, in regards

6    to the statements made by Dr. Macomber under his

7    assessment of dangerousness,

8                 "In considering the potential for

9            dangerous behavior in the institution Mr.

10           Edwards has remained disciplinary free

11           for ten years.  I agree with the prior

12           evaluators that at this point in his life

13           he presents no risk to the institution

14           nor to society.  Compared to other

15           inmates the potential for dangerous

16           behavior is below average.  And in

17           considering the potential for dangerous

18           behavior in the community I also agree

19           with the previous evaluators that say he

20           does not pose any more risk to society

21           than the average citizen in the

22           community.  This is supported by the

23           level of service inventory revisal to the

24           actuarial measure that assesses criminal

25           history, drug abuse, current attitudes

26           and other factors to determine current

27    **CORNELIUS EDWARDS D-74803 DECISION PAGE 3  11/08/06**

76

| | |
|---|---|
| 1 | risk level on parole.  This score places |
| 2 | him in the low risk category.  At this |
| 3 | point in his life he does not pose a risk |
| 4 | to society.  In fact based upon his life |
| 5 | experience and his growth and maturity he |
| 6 | probably poses a lower risk to society |
| 7 | than the average citizen." |
| 8 | Dr. Macomber goes on to state under Clinician |
| 9 | Observations, Comments and Recommendations, that, |
| 10 | "There are no mental or emotional |
| 11 | problems in this case that would |
| 12 | interfere with the routine released |
| 13 | planning.  This man has outstanding |
| 14 | vocational skills, he is fully qualified |
| 15 | and certified in all phases of being an |
| 16 | electrician.  He has several current |
| 17 | valid job offers in high paying |
| 18 | positions. He also has a supportive and |
| 19 | faithful wife that has stuck by him all |
| 20 | of these years.  He has a strong family |
| 21 | support in the community, and all of |
| 22 | these factors are strong indicators that |
| 23 | he will do well in the community.  The |
| 24 | prognosis for successful adjustment in |
| 25 | the community in this case is excellent." |
| 26 | I'd also like to note regarding the |
| 27 | **CORNELIUS EDWARDS D-74803 DECISION PAGE 4  11/08/06** |

1   psychological evaluation dated on June 17th of 2003,


1   psychological evaluation dated on June 17th of 2003,

2   also authored by Dr. Macomber, again is favorable and

3   Dr. Macomber writes under the Assessment of

4   Dangerousness, again,

5        "As a result his potential for violence

6        within the institution is seen as below

7        average in comparison with other

8        inmates. Inmate Edwards' violence

9        potential in the community was high at

10        the time of the commitment offense due

11        to the fact that he was actually

12        involved in trafficking narcotics as

13        well as carrying weapons. This was a

14        deliberate chosen lifestyle. At this

15        point in his life after years of

16        incarceration, realizing how very

17        destructive his lifestyle was and coming

18        to genuine feelings of remorse and

19        sorrow of what he has done, his violence

20        potential is severely reduced. At this

21        point in time, I do not believe that he

22        is more dangerous than the average

23        citizen in the community. He certainly

24        is definitely below average in

25        comparison to other inmates. The only

26        risk factor in this case is inmate

27   **CORNELIUS EDWARDS D-74803 DECISION PAGE 5 11/08/06**

78

| 1 | Edwards himself chosen criminal |
|---|---|

1          Edwards himself chosen criminal
2          lifestyle that he was living at the time
3          of the commitment offense.  This is a
4          thing of the past, and he has made
5          significant changes in his life.  The
6          probability of his reverting back to
7          this destructive lifestyle in view of
8          his realization of what has resulted, is
9          nil.  In addition, he does have
10         excellent vocational trades and will be
11         able to generate a great deal of money
12         in the community which will allow him to
13         support himself without any illegal
14         activities."

15         The base term of compliance of the base life
16    offense for which the prisoner has been convicted is
17    murder in the second degree, P.C. 187, the offense
18    occurred February 1st of 1987.  The term is derived from
19    the Matrix located in CCR Title 15 at 2403 Section C,
20    Second Degree Murder, Offense Committed on or After
21    11/8 of 1978.  The Panel finds that the category B, as
22    in bravo, 3 is appropriate in that B, death was
23    immediate, little or no personal relationship.  The
24    Panel assess 228 months for the base offense, and notes
25    that this is the middle term.  Under adjustments,
26    again, we did adjustments for weapons, there was a
27    **CORNELIUS EDWARDS D-74803 DECISION PAGE 6  11/08/06**

1    12022.5 charge, use of a firearm, in case number
2    A796780, count one, again there was 24 months, reduced
3    to half, totaling 12 months for that. Total term
4    calculation base life term, 228 months, adjustment for
5    the weapon 12 months, making a total of 240 months.
6    Post-conviction credits, post-conviction credit from
7    date life term started 1/8/88 to date of the hearing,
8    which is 11/8/06, 52 months. Total period of
9    confinement is 188 months. Okay.

10        Now, under special conditions of parole, and
11   this is something that you really need to listen
12   carefully, and I know you've heard this before but take
13   it very seriously. I do order you that you do not use
14   alcoholic beverages, you submit to alcohol testing, you
15   submit to anytime (phonetic) narcotic testing, you
16   submit to THC testing, and that you participate in the
17   substance abuse program such as AA/NA.

18        All right. And with that I wish you luck.
19   Again, know that this is there's a couple of steps to
20   go. All right. There will be a decision review and
21   then to the Governor's Office. So I want to let you
22   know is that to try to keep this to yourself. You know
23   how things get when people learn about inmates getting
24   dates and so forth, the grant, so please don't get
25   yourself in any problem that could jeopardize that.
26   Commissioner, anything further to add on this?
27   **CORNELIUS EDWARDS D-74803 DECISION PAGE 7  11/08/06**

80

1        **DEPUTY COMMISSIONER NUGA**:  No.

2        **PRESIDING COMMISSIONER MARTINEZ**:  All right.

3    Good luck.  And this will conclude this hearing.  The

4    time is 6:07 p.m.

5        **ATTORNEY TARDIFF**:  His pink sheet?

6        **PRESIDING COMMISSIONER MARTINEZ**:  He doesn't get

7    one, I believe, does he?

8        **ATTORNEY TARDIFF**:  I think so.

9        **PRESIDING COMMISSIONER MARTINEZ**:  Did you get

10   one last time?

11       **INMATE EDWARDS**:  Yeah.

12       **PRESIDING COMMISSIONER MARTINEZ**:  (Papers

13   shuffling)  Oh yeah, I got to get that copy of that,

14   I'll get that in just a minute.

15       **ATTORNEY TARDIFF**:  Okay.

16       **PRESIDING COMMISSIONER MARTINEZ**:  All right.

17       **ATTORNEY TARDIFF**:  We'll stay for it.

18       **PRESIDING COMMISSIONER MARTINEZ**:  I mean, so I

19   can get that, I'll just finish it up here in a minute.

20       **INMATE EDWARDS**:  Commissioner Martinez, thank

21   you very much.

22       **PRESIDING COMMISSIONER MARTINEZ**:  Good luck.

23        //

24        //

25        //

26        //

27   **CORNELIUS EDWARDS D-74803 DECISION PAGE 8  11/08/06**

81

1        **INMATE EDWARDS:**  And, Deputy Commissioner, thank

2   you, I appreciate it.

3                    A D J O U R N M E N T

4                         --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                    MAR 0 8 2007

23   **PAROLE GRANTED**

24   THIS DECISION WILL BE FINAL ON: _____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   CORNELIUS EDWARDS D-74803 DECISION PAGE 9  11/08/06

82

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, V. OLIVER, a duly designated transcriber,

NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare

and certify under penalty of perjury that I have

transcribed tape(s) which total one in number and cover

a total of pages numbered 1 - 81, and which recording

was duly recorded at CORRECTIONAL TRAINING FACILITY,

SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT

PAROLE CONSIDERATION HEARING of CORNELIUS EDWARDS, CDC

No. D-74803, on NOVEMBER 8, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.

Dated NOVEMBER 20, 2006 at Sacramento County,

California.

_____
V. Oliver
Transcriber
**Northern California Court Reporters**

# EXHIBIT 4



# OFFICE OF THE GOVERNOR

December 22, 2003

*Via Facsimile and U.S. Mail*

Mr. Cornelius Edwards, D-74803
*Correctional Training Facility*
East Dorm – 154L
Post Office Box 686
Soledad, California 93960

Dear Mr. Edwards:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Prison Terms (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Prison Terms.

Sincerely,

PETER SIGGINS
Legal Affairs Secretary

Attachment

cc: Ms. Carol A. Daly, Chairperson, Board of Prison Terms (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**CORNELIUS EDWARDS, D-74803**
**SECOND-DEGREE MURDER**

NO ACTION:            _____

MODIFY:               _____

REVERSE:                    X    _____

The facts in this case are drawn from the decision of the court of appeal upholding the conviction of Cornelius Edwards for second-degree murder. The victim, Daryl Bradley, furnished cocaine to Mr. Edwards to sell, and Mr. Edwards had not repaid him. On February 1, 1987, Ronald Hosey and Mr. Bradley were looking for Mr. Edwards to get the money. When they met him, Mr. Edwards said that he would sell some jewelry to repay the debt and he would return. Bradley had an unloaded gun but was not pointing it at anyone. At some point after Mr. Edwards left, Mr. Hosey and Mr. Bradley went to the home of Charline Baines.

Mr. Edwards was already at the home of Ms. Baines smoking cocaine in the kitchen with others. Someone told him that Mr. Bradley was looking for him. Mr. Edwards got up from the table periodically to look out a window. He stated that if Mr. Bradley came back, he might have "to take him."

When Mr. Hosey and Mr. Bradley arrived at the Baines' residence, Mr. Bradley and Mr. Edwards began to shout. Mr. Edwards moved his hand to his belt where his gun was located. Mr. Bradley called him a punk. They were within a couple of feet of each other and Mr. Bradley was advancing upon Mr. Edwards. Mr. Edwards then fired his gun, a .357 magnum, fatally shooting Mr. Bradley through the eye from a distance of no more than twelve inches. When the police arrived, Mr. Bradley's left front pocket had been turned inside out, and the police could not find Mr. Bradley's cash, cocaine, wallet, or gold chain. Although witnesses testified that Mr. Bradley was not carrying a gun when he confronted Mr. Edwards, at his most recent parole hearing Mr. Edwards insisted that he knew Mr. Bradley was armed.

This was a brutal and senseless murder that Mr. Edwards has consistently tried to justify as self-defense despite the fact that all of the evidence is to the contrary. In reality, the motive for the offense was trivial in that Mr. Edwards seemed more concerned at the time with ingesting cocaine than with repaying his drug debt. Given the prior implied threat to kill Mr. Bradley if he returned to the Baines' residence, the murder was carried out in a dispassionate and calculated manner. The heinous nature of the offense itself convinces me that Mr. Edwards is not suitable for parole at this time.

The Board of Prison Terms found that Mr. Edwards committed the crime as a result of significant stress in his life, but it did not cite any facts to support that finding. I do not find the

difficulty of confronting a fellow drug dealer who is seeking repayment for his wares to be the type of stress that in any way mitigates murder.

Upon a thorough review of the records in this case, I find very little to suggest that Mr. Edwards could be safely released to parole at this time. Mr. Edwards has a lengthy and violent criminal history that demonstrates he has a difficult time conforming his behavior. In 1979, he was given diversion on a charge of PCP possession, but he failed to report to the probation office or the court. In 1980, he was sentenced to county jail and probation for a conviction of sales or transportation of PCP. The following year, he pled nolo contendre to a charge of exhibiting a firearm and was granted probation. In a separate incident a month later, he pled guilty to carrying a loaded firearm in a public place. He was again placed on probation with some county jail time. Just two months later he was again arrested and pled guilty to a charge of battery for which he was once again given probation. In 1984, Mr. Edwards pled guilty to sale of a substance in lieu of a controlled substance. Yet again, he was placed on probation. Later that year he was convicted of shooting at an inhabited dwelling. He was given a suspended sentence to state prison and five years of probation. In 1986 his probation was revoked for deserting. While not certain, it appears he was on probation at the time he murdered Mr. Bradley.

Even a life sentence for murder did not help Mr. Bradley control his behavior as demonstrated by the five prison disciplinary rule violations he received. These included fighting, conspiracy to introduce narcotics into the institution, and possession of a sharpened piece of metal. To his credit, Mr. Edwards has not been disciplined since 1996. However, given his history of repeated criminal and violent misconduct and his utter inability to benefit from numerous grants of probation, I believe Mr. Edwards requires a longer period of discipline-free incarceration before he can be trusted to live a law-abiding life outside of prison.

Mr. Edwards has shaky parole plans that need development including either an offer of employment or a firm plan. Mr. Edwards states that he wants to be an entrepreneur, but he must have a job first. It is clear from his discussion of his drug dealing that he considered himself a businessman at the time of the offense. I have grave concerns that with a family to care for and no job, Mr. Edwards will slip back into the only business he knows.

Mr. Edwards is unquestionably an intelligent and ambitious man who has made significant strides in leaving behind a life of crime. He committed a heinous crime, however, which followed years of unremitting criminal behavior. More years of misconduct followed in prison. Mr. Edwards needs more time to prove he can maintain his gains and more definite parole plans before he can safely be released.

Cornelius Edwards, D-
Second-Degree Murder
Page 3

I believe Mr. Edwards would pose an unreasonable threat to public safety if released at this time. Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Edwards.

Decision Date: 12|22|03

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT 5

CRITICAL FILED

NOV 2 3 2004

LOS ANGELES
SUPERIOR COURT

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

In re,                                    ) Case No.: BH002879
                                          )
CORNELIUS EDWARDS,                        ) ORDER RE: WRIT OF HABEAS CORPUS
                                          )
        Petitioner,                       )
                                          )
    On Habeas Corpus                      )
                                          )
_____)

The Court has read and considered Petitioner's Writ of Habeas Corpus filed on August 31, 2004. Having independently reviewed the record, giving deference to the broad discretion of the Governor in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's finding that Petitioner is unsuitable for parole. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *see* Cal. Code Regs., tit. 15, §2402.)

The Governor is constitutionally authorized to make "an independent decision" as to parole suitability. (*Rosenkrantz, supra,* at 670.) Only a "modicum of evidence" is required. (*Id.* at 677.) Here, the record contains "some evidence" to support the Governor's conclusion that Petitioner is unsuitable for parole because he has a previous record of violence (Cal. Code Regs., tit. 15, §2402(c)(2)) and has engaged in serious misconduct while incarcerated (Cal. Code Regs., tit. 15, §2402(c)(6); Cal. Code Regs., tit. 15, §3315).

The Governor also found Petitioner unsuitable for parole, concluding that the commitment offense was carried out in a "dispassionate and calculated manner" and that the motive for it was "trivial." (Cal. Code Regs., tit. 15, §2402(c)(1)(B), (E).) However, the record

1    reflects that during a confrontation with the victim over a drug debt, Petitioner shot and killed the

2    victim.[1] Therefore there is no evidence that the motive was *inexplicable or very trivial* (Cal.

3    Code Regs., tit. 15, §2402(c)(1)(E)(emphasis added)) or "especially heinous, atrocious, or cruel"

4    because it was carried out in a dispassionate and calculated manner. (Cal. Code Regs., tit. 15,

5    §2402(c)(1)(B).) The Court also rejects the Governor's finding that Petitioner does not have

6    realistic parole plans because he does not have a job offer. The record reflects while incarcerated

7    Petitioner has "developed marketable skills that can be put to use upon release." (Cal. Code

8    Regs., tit. 15, §2402(d)(8).)

9

10    The Court rejects Petitioner's argument that the Board of Prison Terms' conclusion that

11    the life offense was committed as a result of significant stress in his life, was improperly rejected

12    by the Governor. (Cal. Code Regs., tit. 15, §2402(d)(4).) Stress caused by involvement in the

13    drug culture is hardly the type of "significant stress" contemplated by the statute. The Court also

14    rejects Petitioner's argument that the Governor's review pursuant to California Constitution, Art.

15    V, section 8 and Penal Code section 3041.2, violates the *ex post facto* clause of the United States

16    Constitution. The argument has been specifically rejected by the California Supreme Court.

17    (*Rosenkrantz, supra,* at 659-661 and 684.)

18    Accordingly, the petition is denied.

19

20    November_____ 2004

21

22

23



TERRY A. GREEN
Judge of the Superior Court

24

25    Clerk to give notice.

26

27    _____

28    [1] The Court considers Petitioner's argument that the Governor based his findings on a rendition of the facts taken from a source different than the source used by the Board of Prison Terms, irrelevant in light of the Court's ruling on the Governor's conclusions.

# EXHIBIT 6

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

[x] **PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

A. Base time in prison.................................................... _____ Months

_____    _____    _____
Case #                    Count #          Offense

B. Time for using a weapon.............................................. + _____ Months

C. Time for other crimes................................................. + _____ Months

| Case # | Count # | Offense | Months |
|--------|---------|---------|--------|
|        |         |         |        |
|        |         |         |        |
|        |         |         |        |

D. Total term............................................................ = _____ Months

E. Time credit from _____ to _____ - _____ Months
              (Life term start date)  (Date of hearing)

F. ..................................................................... = _____ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

**HEARING PANEL**

Name _____    Date _____

Name _____    Date _____

Name _____    Date _____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
|      |      |        |      |

**BPT 1005(a)**(REV. 01/02)                    Distribution: White –C. File
Canary- BPT
Pink- Prisoner

# EXHIBIT 7

**MENTAL HEALTH EVALUATION FOR**
**THE BOARD OF PRISON HEARINGS**
**June, 2006 Lifer Calendar**

**CORRECTIONAL TRAINING FACILITY SOLEDAD**
**MAY, 2006**

| | |
|---|---|
| **NAME:** | **EDWARDS, CORNELIUS** |
| **CDC#:** | **D-74803** |
| **DOB:** | **7/9/60** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **2/1/87** |
| **SENTENCE:** | **15 YEARS TO LIFE** |
| **MEPD:** | **2/27/97** |
| **EVALUATION DATE:** | **5/18/06** |

## I.    IDENTIFYING INFORMATION:

Mr. Cornelius Edwards is a 45 year old, first term, married, African-American male from Los Angeles County. He is a Christian. He has served 19 years in custody on this offense.

### SOURCES OF INFORMATION:

This evaluation is based upon a single 2 hour interview, plus review of the central and medical files.

The previous psychological evaluation by Dr. Kamdar, Psychiatrist, CTF-Soledad, dated 11/18/00, contains a Psychosocial Assessment that is still current and valid. As a result, this information will not be repeated at this time.

**EDWARDS, CORNELIUS**
**D-74803**
**5/18/06**
**PAGE 2**

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Edwards is well known to this writer, because I interviewed him on 6/17/03
for his BPT hearing at that time. As a result of that hearing, he was found suitable
for parole. However, the Governor reversed the Board's findings and revoked his
parole.

Mr. Edward's mental status is entirely within normal limits. He related in an
open, cooperative and non-defensive manner. There were no indications of any
mental or emotional problems in this case. There was no evidence of anti-social
thinking or values. His thinking was very pro-social. He does have deep feelings
for others, empathy towards others' suffering, deep family loyalties and
connections; and his values are highly positive and constructive.

Mr. Edwards has been very active in participating in self-help programming since
his last board appearance. He has completed the Cage or Rage Anger
Management Program, the Impact Program which took 12 weeks to finish,
another anger management program sponsored by PIA Industries, as well as a
book report sponsored by the psychology department on Caring Enough to
Confront. In addition, he continues to be active in Alcoholics Anonymous and
Narcotics Anonymous.

His prior history has been discussed in my prior evaluation, as well as elsewhere.
This will not be repeated at this time.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 95

### XIII.    REVIEW OF LIFE CRIME

Mr. Edwards accepts full responsibility for the commitment offense. As I
mentioned in my prior evaluation, the important fact of this case is that Mr.
Edwards was very frightened, even terrified of the victim, who had been armed

**EDWARDS, CORNELIUS**
**D-74803**
**5/18/06**
**PAGE 3**

with a gun earlier and had been pursuing him throughout the day in a state of
anger and rage. Mr. Edwards had seen the victim grab an M-I Carbine and shoot
a man to death, shooting him five times in a very brutal and cruel manner simply
over an argument about a dice game. Mr. Edwards certainly knew how dangerous
the victim was. Also, two weeks prior to the commitment offense, the victim shot
another individual. All of these factors contributed to the high level of stress and
fear that Mr. Edwards was experiencing at the time of the commitment offense.
Mr. Edwards wants to make it very clear that he is not excusing his behavior in
the commitment offense. He readily states that he was wrong at that time. He
was living the wrong kind of lifestyle. He stated that this offense should have
never happened. He knows that he was wrong at the time. He is not trying to
minimize his culprability in this offense. He is trying to explain the background
circumstances and the factors that were in operation at the time of the offense. He
is very sorry that the offense happened. He knows that his actions caused a far
ranging impact on the victim's family. His own family has suffered greatly due to
his incarceration. At this point in his life, he is able to look back on his situation
and know that he acted in an irresponsible manner. Mr. Edwards has changed
dramatically over the years in a positive direction. He has matured and developed
strong pro-social values, and he is now an adult that is able to look back on his
life and understand his past mistakes.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, Mr.
Edwards has remained disciplinary free for 10 years. I agree with the
prior evaluators that stated that at this point in his life, he poses no risk to
the institution or to society. Compared to other inmates, potential for
dangerous behavior is below average.

B. In considering potential for dangerous behavior in the community, I also
agree with the previous evaluators, who state that he does not pose any
more risk to society than the average citizen in the community. This is
supported by the Level of Service Inventory-Revised, which is an actuarial
measure that assesses criminal history, drug abuse, current attitudes and
other factors to determine current risk level on parole. His score places
him in the low risk category. At this point in his life, he does not pose a
risk to society. In fact, based upon his life experiences and his growth and
maturity, he probably poses a lower risk to society than the average
citizen.

C. There are no significant risk factors in this case.

Edwards            D-74803            CTF-Soledad            5/18/06

**EDWARDS, CORNELIUS**
**D-74803**
**5/18/06**
**PAGE 4**

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with
routine release planning. This man has outstanding vocational skills. He is fully
qualified and certified in all phases of being an electrician. He has several
current, valid job offers in high paying positions. He also has a supportive and
faithful wife that has stuck by him all of these years. He has strong family
support in the community. All of these factors are strong indicators that he will
do well in the community. The prognosis for successful adjustment in the
community in this case is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:     5/18/06**
**T:     5/19/06**

# EXHIBIT 8

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### JULY 2003 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JUNE 17, 2003

This is a psychological evaluation for the Board of Prison Terms for inmate Cornelius Edwards, CDC# D-74803. This report is based upon a personal clinical interview of the inmate, conducted on 06/17/03, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Edwards is a 42-year-old (DOB 07/09/60), divorced, first term, African-American male who is serving a 15-year to life sentence from Los Angeles County for the offense of PC 187, Murder, Second Degree. This offense occurred on 02/01/87. His MEPD is 02/27/97. This report was prepared for the July 2003 Lifer Calendar.

The previous BPT panel requested a current psychological evaluation to assess current potential for violence in the community, the importance of alcohol and drugs in his life, and an estimate of his ability to refrain from them, the extent to which he has explored the commitment offense, and come to terms with the underlying causes, and whether he needs further psychotherapy in prison.

Inmate Edwards was interviewed for two hours on this date (06/17/03). His hygiene and grooming were appropriate. His thinking was rational, logical, and coherent. He was alert and well oriented. His speech was normal, goal-oriented, and fluent. Intellectually, he appears to be functioning in the high average range. His affect was appropriate. There was no evidence of anxiety or depression. His mood was friendly, outgoing, cooperative, and cheerful. There is no evidence of psychopathology. There is no history of mental or emotional problems in this case.

Inmate Edwards was initially arrested at the age of 13 for possession of a dangerous weapon, and assault with a deadly weapon. As an adult, he has been arrested for possession of drugs, transportation of PCP, carrying a loaded firearm, battery, and shooting at an inhabited dwelling. When he was 19 years of age, his father was killed. He was raised in a criminally-oriented neighborhood in Los Angeles. He stated that he was supporting himself by sales of drugs at the time of

EDWARDS, CORNELIUS
CDC NUMBER: D-74803
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

the commitment offense. He was 26 years of age when he committed the murder of Darryl Bradley, who was also a drug dealer.

Inmate Edwards purchased marijuana in the institution in 1989. As a result, he was implicated in a drug trafficking network. He stated that he woke up at that point in time, realized how destructive drug use could be, and was, in his life. He decided to stop any involvement in drug use. There is no indication that he has become involved in drug use since that time.

Inmate Edwards does have a history of alcohol and drug use. He used alcohol on a social basis. He used drugs also on a social basis. He has used marijuana, cocaine, PCP and LSD. There is no indication that he was ever addicted to these substances. He was not intoxicated on drugs or alcohol at the time of the commitment offense. The commitment offense was related to his criminally-oriented lifestyle that he was living at the time. If he had not been involved in the sale of drugs, this event would have never occurred.

In considering current diagnostic factors, it is obvious that this man was living a criminally-oriented lifestyle prior to the commitment offense. It is understandable that he has been diagnosed as having an antisocial personality disorder in prior evaluations. However, I think at this time he has changed his life. His values and goals are markedly different from the way they were when he was a young man.

The victim's family has contacted inmate Edwards, and asked him very pointed and meaningful questions. As a result, he has had to explore his prior lifestyle, his behavior at that time, and his actions. In the letters that he has written to them, he shows that he has carefully explored the dynamics associated with the commitment offense, and the pathological/criminal aspects that he was living at the time, possibly from having to deal with the victim's family, and face the consequences of the disaster that he has caused in their lives by the commitment offense, he has developed a deep sense of empathy and concern for them and their loss. A person with an antisocial personality disorder usually maintains the same selfish, destructive, self-centered lifestyle throughout his lifetime. I do not see evidence of this at this time in this case. There is no indication in the interview of values or thinking that could be characterized as antisocial. It is evident that inmate Edwards has changed significantly. As a result, I do not think that he currently qualifies for the diagnosis of antisocial personality. If anything, it could be stated that he had traits of antisocial personality disorder in the past, which have now been resolved. I also cannot find evidence of extensive drug abuse or dependence that would warrant a diagnostic label in this case.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:       No Contributory Clinical Disorder.
AXIS II:      No Contributory Personality Disorder.
AXIS III:     No Contributory Physical Disorder.

EDWARDS        D-74803        CTF-CENTRAL        06/17/03        gmj

EDWARDS, CORNELIUS
CDC NUMBER: D-74803
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

      **AXIS IV:**    Incarceration.
      **AXIS V:**     GAF = 90.

## XIII.  REVIEW OF LIFE CRIME:

Details of the commitment offense were discussed at length. The important factors appear to be that inmate Edwards was very frightened of the victim, who was armed with a gun, and had been actively pursuing him throughout the day in a state of anger and rage.

The fact that the victim was angry was due to the belief that inmate Edwards had boycotted him from the housing project as a drug dealer. Inmate Edwards denies this, but understands that this belief caused the victim to be angry, aggressive, and assaultive. Inmate Edwards readily admits that he shot the victim on purpose while the victim was armed and threatening. He also noted that the victim had killed other people in the past, and he knew he was an extremely dangerous individual. He stated that he witnessed the victim assassinate Donny Parker for not apologizing to him. Two weeks prior to the commitment offense, the victim had shot another individual. Inmate Edwards is not trying to use these factors to justify his killing of the victim, but they are factors that did contribute towards his high level of stress.

In discussing this offense, inmate Edwards states that it should not have happened, and would not have happened if he had been behaving in a more responsible manner. The fact that he has left a young girl fatherless, and sisters without their brother, has had a dramatic impact on him. Inmate Edwards's statements of remorse appeared to be quite sincere and genuine.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A. Inmate Edwards has been free from any drug use now for 14 years. He also has refrained from any aggressive behavior in the institution since that time. He does show evidence of considerable growth and maturity in his life. As a result, his potential for violence within the institution is seen as below average in comparison to other inmates.

B. Inmate Edwards's violence potential in the community was high at the time of the commitment offense due to the fact that he was actively involved in trafficking narcotics, as well as carrying weapons. This was a deliberate, chosen lifestyle. At this point in his life, after years of incarceration, realizing how very destructive his lifestyle was, and coming to genuine feelings of remorse and sorrow at what he has done, his violence potential is severely reduced. At this point in time, I do not believe that he is more dangerous than the average citizen in the community. He certainly is definitely below average in comparison to other inmates.

EDWARDS, CORNELIUS
CDC NUMBER: D-74803
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

**C.** The only risk factor in this case is inmate Edwards's self-chosen, criminal lifestyle that he was living at the time of the commitment offense. This is a thing of the past, and he has made significant changes in his life. The probability of his reverting back to this destructive lifestyle, in view of his realization of what it has resulted in, is nil. In addition, he does have excellent vocational trades that will be able to generate a great deal of money in the community, which will allow him to support himself without any illegal activities.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

**A.** Inmate Edwards has several factors in his life that would indicate a successful parole adjustment. He does have excellent vocational skills as a certified electrician. Not only is he certified in residential, but he is certified in commercial, as well as industrial. This means that he is highly employable, and he will have a very good income in the community. In addition, he also has skills as a welder, and even as a forklift operator. He has a very strong and supportive relationship with his ex-wife. She is still very supportive, and he has a 17-year-old daughter that he corresponds with on a regular basis. He also has the strong support of his mother and siblings, who live in Fresno, California.

**B.** At this point in his life, I do not believe that drug or alcohol use is a risk factor. He was never seriously addicted to these substances. His ability to refrain from them at this point in his life is equal to the average citizen. He has adequately explored factors underlying the commitment offense, the offensiveness of the offense itself, and he has come to terms with this offense in his life. I do not see a need for further participation in psychotherapy programs. There is no evidence of mental or emotional problems in this case that would interfere with his being granted a parole date.

In fact, this writer has supervised over 50 life-term parolees in the community while a parole agent in Los Angeles. I would have no hesitation at all supervising this inmate on parole. The prognosis for his excellent adjustment on parole in the community is excellent.

*Melin Macomber pW*

M. MACOMBER, Ph.D.
Clinical Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

EDWARDS          D-74803          CTF-CENTRAL          06/17/03          gmj

**EDWARDS, CORNELIUS**
**CDC NUMBER: D-74803**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE FIVE**

*[signature]* , Ph. D.

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

RT/gmj

D:  06/17/03
T:  06/20/03

CORNELIUS EDWARDS, D-74803
CTF-EAST DORM (ED-157L)
P.O. Box 689
SOLEDAD, CA 93960

RECEIVED

APR - 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LEGAL MAIL

UNITED STATES DISTRICT Court
NORTHERN DISTRICT of California
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102